**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 24-cv-2679**

THE ESTATE OF AVERY JAMES BORKOVEC,
by and through its co-personal representatives Dylan Bolt and Chris Borkovec

      Plaintiff,

v.

TURN KEY HEALTH CLINICS, LLC;
CITY AND COUNTY OF BROOMFIELD;
ENEA HEMPELMANN, in her official capacity;
MAXIM HEALTHCARE STAFFING SERVICES, INC, a/k/a AMERGIS HEALTHCARE
STAFFING, INC.;
THE BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO;
SHERIFF CURTIS JOHNSON, in his official capacity;
BRYAN REICHERT, individually;
CHANTEL TREVIZO, individually;
NELY MORENO-SANTACRUZ, individually;
DEYANIRA MARTINEZ; individually
SHONDA HIGH; individually;
KAELA SEEBURGER; individually;
ALEXIS HENDERSON; individually;
TIFFANY JONES; individually;
MEL PARKER; individually;
JACK MARKLING; individually;
JENNIFER SAMUELS; individually;
BLAKE MORROW; individually;
CHARLES ROBERT DAVIS; individually;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff, by and through the attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN,

LLC, complains against Defendants and requests a trial by jury as follows:

## I.    INTRODUCTION

1.     Avery James Borkovec was only 22 years old when he died on November 3, 2022 while detained at the Boulder County Jail ("Boulder" or "the jail").

2.     He died of staphylococcus aureus bacteremia ("staph bacteremia"), endocarditis, and sepsis – easily treatable conditions that would not have killed him had Defendants provided proper and timely medical attention and treatment.

3.     Prior to being transferred to Boulder, Mr. Borkovec was detained for a week at the Broomfield Detention Center ("Broomfield").

4.     From day one, Broomfield staff understood that he had a serious bacterial infection, which, if not monitored and treated adequately, could cause him serious injury or death.

5.     Specifically, Broomfield health care workers knew that three days before he arrived at their detention center, Mr. Borkovec's white blood count ("WBC") was extremely elevated, and that he had staphylococcus aureus ("staph") bacteria in his blood.

6.     Even though they knew that Mr. Borkovec's recent lab results showed he had bacteremia, and despite knowing and that he was exhibiting clear signs and symptoms of a serious bacterial infection, Broomfield doctors and nurses recklessly chose not to send him to the hospital or even start him on antibiotics.

7.     Then, when Mr. Borkovec was transferred out of the Broomfield Detention Center, medical staff did not inform Boulder County Jail that Mr. Borkovec was known to have staph bacteremia. They withheld this information despite knowing that without treatment he was likely to become septic and suffer serious injury and/or death.

8.     Although he reported a deeply concerning constellation of symptoms on a nearly daily basis at the Boulder County Jail, nurses did not assess Mr. Borkovec, monitor his vital signs,

or obtain higher level evaluation. Rather, they repeatedly recklessly arrogated to themselves medical decision making that was outside of their legal scope of practice.

9.      It was apparent to the many laypeople who saw him that Mr. Borkovec was gravely ill and needed to be hospitalized. Instead, his infection went entirely untreated and was allowed to ravage his body for more than a month before it finally shut down.

10.     Throughout the month he was in Boulder, health care workers only took Mr. Borkovec's vital signs three times. The only time any health care worker collected a complete set of vital signs was on October 7, 2022 – during his intake screening.

11.     The night before he died, Mr. Borkovec complained of shortness of breath and was obviously in the throes of a medical emergency.

12.     He was seen by medical staff for less than seven minutes before being cleared to stay in the Jail and moved to a single cell, where not even other inmates could observe or help him.

13.     Avery Borkovec died a harrowing, gruesome, and painful death on the floor of the Boulder County Jail surrounded by his own blood and vomit as a result of deliberate indifference to his known serious medical needs by Defendants.

## II.      JURISDICTION AND VENUE

14.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

15.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.    PARTIES

16.    At all times pertinent hereto, the decedent, Avery James Borkovec, was a resident of the State of Colorado and a citizen of the United States of America.

17.    The Estate of Avery James Borkovec was opened in Boulder County. Mr. Borkovec's Great Uncle, Chris Borkovec, and half-brother, Dylan Bolt [1] are co-personal representatives of the Estate. Avery James Borkovec has no surviving parents or children.

18.    Defendant City and County of Broomfield is a Colorado municipal corporation and is the legal entity responsible for itself and for the Broomfield Detention Center ("Broomfield").

19.    Defendant Enea Hempelmann, in her official capacity, is the Chief of Police for the City and County of Broomfield and is a final policy maker for the City and County of Broomfield with respect to all matters concerning the Police Department and all of its divisions, including the Broomfield Detention Center.

20.    Defendant Broomfield is properly sued under 42 U.S.C. § 1983 for its own deliberately indifferent policies and practices with respect to the provision of medical care and treatment for inmates. It is also properly sued for the deliberately indifferent policies and practices of Turn Key Health Clinics, LLC. Although Broomfield has sought to privatize the provision of healthcare services to its population of pre-trial detainees and post-conviction inmates, it has a non-delegable duty to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices, and practices as moving forces in the deliberately indifferent medical care and treatment of persons

---

[1] Mr. Bolt was substituted as co-personal representative for the Estate following Shirley Borkovec's passing.

detained in the Broomfield, including Mr. Borkovec, by its contractors, their agents, and employees, including the named individual caregivers.

21.     Defendant Turn Key Health Clinics, LLC, is a private Oklahoma corporation doing business in the state of Colorado with its principal address located at 900 NW 12th Street, Oklahoma City, OK, 73106, with its registered agent in Colorado at InCorp Services, Inc., 36 South 18th Avenue, Suite D, Brighton, CO 80601.

22.     Defendant Turn Key is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates. Upon entering into contracts or subcontracts to provide medical and/or other services to Broomfield Detention Center inmates, Turn Key assumed public functions, acted under color of state law, and is legally responsible to comply with all requirements of the United States Constitution.

23.     Defendants Broomfield, Hempelmann, and Turn Key are collectively referred to herein as the "Turn Key" or the "Broomfield Entity Defendants."

24.     At all times relevant hereto, Defendant LPN Chantel Trevizo was a citizen of the United States and a resident of Colorado. Defendant Trevizo was an agent, employee, and/or subcontractor of Defendant Turn Key, and was responsible for providing medical care to Avery Borkovec during his detention. At all material times, this Defendant was acting under color of state law.

25.     At all times relevant hereto, Defendant LPN Nely Moreno-Santacruz was a citizen of the United States and a resident of Colorado. Defendant Moreno-Santacruz was an agent, employee, and/or subcontractor of Defendant Turn Key, and was responsible for providing

medical care to Avery Borkovec during his detention. At all material times, this Defendant was acting under color of state law.

26.     At all times relevant hereto, Defendant Dr. Bryan Reichert was a citizen of the United States and a resident of Colorado. Defendant Reichert was an agent, employee, and/or subcontractor of Defendant Turn Key and was responsible for providing medical care to Avery Borkovec during his detention. At all material times, this Defendant was acting under color of state law.

27.     Defendants Trevizo, Moreno-Santacruz and Reichert are collectively referred to as the "Individual Turn Key Defendants."

28.     Defendant Maxim Healthcare Staffing Services, Inc. is a Maryland corporation with is principal street address as 7223 or 7227 Lee Deforest Drive, Columbia, MD, 21046.  Its registered agent of service in Colorado is the Corporation Service Company, 1900 W. Littleton Blvd, Littleton, CO 80120. Maxim Healthcare Staffing Services, Inc is also known as Amergis Healthcare Staffing, Inc, having changed its name in 2024. This Defendant contracted with Boulder County to provide nursing services to inmates at Boulder. Further this Defendant employed Defendants Shonda High and Blake Morrow.  This Defendant is referred to herein as "Maxim."

29.     Maxim is a proper entity to be sued under 42 U.S.C. § 1983 for its own deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of Maxim employed individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs. Maxim was acting under color of state law and performing a traditional function of the state.

30.     Defendant Boulder County Board of County Commissioners ("BOCC") is a governmental entity chartered under the laws of the State of Colorado and is the public entity ultimately responsible for the operation of the Boulder County Jail. Defendant BOCC represents, oversees, and sets policy for Boulder County, Colorado. Among other things, BOCC, through the Boulder County Sheriff's Office ("Sheriff"), operates the Boulder County Jail ("Boulder" or "the Jail"). Under Colo. Rev. Stat. § 30-11-105, the BOCC is the proper party in an action against Boulder County. BOCC has statutory and constitutional obligations to assure adequate medical care and treatment for inmates and pretrial detainees at Boulder County Jail.

31.     Defendant Curtis Johnson, in his official capacity, is the Boulder County Sheriff and is a final policy maker for Boulder County with respect to all matters concerning the Sheriff's Office and all of its divisions, including the Boulder County Jail.

32.     The Boulder County Sheriff, the BOCC, and Maxim are collectively referred to herein as "the Boulder Entity Defendants."

33.     Boulder Entity Defendants are sued under 42 U.S.C. § 1983 with respect to the hereinafter challenged deliberately indifferent policies and practices for the care and treatment of persons detained at the Boulder County Jail.

34.     The Boulder County Sheriff and the BOCC are directly liable for their own deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of County employed individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs, and are liable under the non-delegable duty doctrine for the deliberately indifferent policies of Defendant Maxim.

35.     At all times relevant hereto, Defendant RN Alexis Henderson was a resident of

Colorado and a citizen of the United States of America. Defendant Henderson was an employee of the Boulder County Jail and acting under color of state law.

36.     At all times relevant hereto, Defendant RN Tiffany Jones was a resident of Colorado and a citizen of the United States of America. Defendant Jones was an employee of the Boulder County Jail and acting under color of state law.

37.     At all times relevant hereto, Defendant RN Deyanira Martinez was a resident of Colorado and a citizen of the United States of America. Defendant Martinez was an employee of the Boulder County Jail and acting under color of state law.

38.     At all times relevant hereto, Defendant Dental Assistant Mel Parker was a resident of Colorado and a citizen of the United States of America. Defendant Parker was an agent, employee, and/or subcontractor of the Boulder County Jail and acting under color of state law.

39.     At all times relevant hereto, Defendant Kaela Seeburger was a resident of Colorado and a citizen of the United States of America. Defendant Seeburger was an employee of the Boulder County Jail and acting under color of state law.

40.     At all times relevant hereto, Defendant RN Jack Markling was a resident of Colorado and a citizen of the United States of America. Defendant Markling was an employee of the Boulder County Jail and acting under color of state law.

41.     At all times relevant hereto, Defendant Blake Morrow was a resident of Colorado and a citizen of the United States of America. Defendant Morrow was an employee of Maxim placed in the Boulder County Jail and acting under color of state law.

42.     At all times relevant hereto, Defendant LPN Shonda High was a citizen of the United States and a resident of Colorado. Defendant High was an agent, employee, and/or

subcontractor of Maxim placed in the Boulder County Jail and acting under color of state law.

43.     At all times relevant hereto, Defendant NP Jennifer Samuels was a resident of Colorado and a citizen of the United States of America. Defendant Samuels was an employee of the Boulder County Jail and acting under color of state law.

44.     At all times relevant hereto, Defendant Dr. Charles Robert Davis was a resident of Colorado and a citizen of the United States of America. Defendant Davis was an agent, employee, and/or subcontractor of the Boulder County Jail and acting under color of state law.

45.     Defendants Martinez, High, Seeburger, Henderson, Jones, Parker, Markling, Samuels, Morrow, and Davis are referred to herein as the "Individual Boulder Medical Defendants."

## IV.     STATEMENT OF FACTS

46.     A common and recurring condition among inmates in all jails, including Broomfield and Boulder, is intravenous ("IV") drug use.

47.     Evaluating and addressing the needs of inmates with a recent history of IV drug use, as well as associated medical conditions, is a usual and recurring task for health care workers and detention staff in jails.

48.     Bacterial infections, especially blood borne infections, are common among IV drug users. Fortunately, these infections are easily treatable with antibiotics and other routine medical interventions. If left untreated, however, these infections are life-threatening.

49.     "Health care workers," as used herein, includes Emergency Medical Technicians ("EMT"), Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), Nurse Practitioners ("NP"), Physicians' Assistants ("PA"), and doctors.

50.     "Health care providers," as used herein, includes NPs, PAs, and doctors.

51.     "Nurses," as used herein includes LPNs and RNs.

52.     Correctional health care workers have a responsibility and obligation to their patients to ensure that medical, mental health, and dental care is coordinated and monitored from admission to discharge.

53.     All reasonably trained correctional health care workers know that clear communication between sending and receiving facilities is essential, and that such communications must include information about current treatments, medications, scheduled appointments and diagnostic studies in order to give the receiving facility a clear picture of the current treatment needs of the arriving patient.

54.     All reasonably trained correctional healthcare workers know that the transfer process poses a barrier to continuity and coordination of care, and that a receiving facility must get patient information from transferring facilities, including the patient's pertinent health history, current treatments, prescribed medications, scheduled appointments, referrals, and diagnostic studies.

55.     All reasonable health care workers are aware that infection is a complication of IV drug use.

56.     All reasonable health care workers are aware that infections require medical intervention and, if untreated, are likely to get worse and can lead to sepsis and death.

57.     Given the significant risk of serious injury and death associated with untreated infections, every health care worker in a county correctional facility must know the risks of such infections, including sepsis and endocarditis, and must be able to recognize the signs and symptoms thereof.

58.     All reasonable health care workers are aware that aching joints and muscles, shortness of breath, chest pain, difficulty breathing, fatigue, pallor, fever, chills, and/or sweating are symptoms that may be related to a serious medical condition, particularly in an IV drug user, and must be timely medically evaluated.

59.     All reasonable health care providers are aware that common infections among inmates with a recent history of IV drug use are skin infections, blood infections and heart infections (endocarditis) and they must be able to recognize the signs and symptoms of a possible infection and order appropriate testing and/or treatment.

60.     All reasonable health care providers are aware that the classic presentation of a heart infection includes aching joints and muscles, shortness of breath, chest pain, difficulty breathing, fatigue, fever, chills, sweating and/or heart murmur.

61.     All reasonable health care workers know that a 22-year-old person with several weeks of vomiting, coughing, insomnia, extreme tooth pain, pallor, migraines, anxiety, weight loss, fatigue, severe back pain and tightness, severe diffuse body pain and soreness, difficulty walking, a yellowish tinge to their skin, and difficulty breathing must be immediately hospitalized for these critical symptoms, or risk severe injury and death.

62.     All reasonable health care workers know that the normal pulse for healthy adults ranges from 60 to 100 beats per minute. All reasonable health care workers know that a pulse below 60 or above 100 is an abnormal vital sign.

63.     All reasonable health care workers know that a persistently elevated pulse is often caused by infection.

64.     All reasonable health care workers also know that very low oxygen saturation is a

critical abnormal vital sign that must be timely evaluated and treated or a person is likely to suffer serious injury or death.

65. Nurses have a duty to convey any abnormal vital signs or symptoms to a provider who can diagnose the cause of the abnormal findings.

66. All trained nurses know that failure to communicate abnormal findings to a provider can cause serious injury or death.

67. It is outside nurses' scope of practice to diagnose or determine the cause of abnormal vital signs or symptoms or disregard them as unimportant. Registered Nurses may form nursing diagnoses, but must convey any abnormal findings to a provider licensed to form medical diagnoses. Licensed Practical Nurses can collect information about a patient under the supervision of a Registered Nurse, but cannot form nursing diagnoses.

68. It is unconstitutional for a health care worker who knows that her role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, to delay or deny the patient access to such personnel.

69. On September 26, 2022, Avery James Borkovec ("Mr. Borkovec") was taken to the Emergency Department at Good Samaritan Hospital for abdominal pain and persistent vomiting.

70. At the hospital, he was given IV fluids and anti-nausea medications to treat his nausea and vomiting.

71. Doctors at Good Samaritan also ordered a Complete Blood Count ("CBC") and blood culture.

72. The CBC revealed that Mr. Borkovec had an extremely elevated white blood cell count of 17.77 K/uL, indicating that he was fighting an infection, likely bacterial.

73.     Unfortunately, Mr. Borkovec was discharged from the hospital before the final blood culture results came back, which showed he had staph bacteremia – an infection of the bloodstream.

74.     Staph bacteremia is a serious infection that has a high risk of complications and death if left untreated. Once staph bacteria are in the bloodstream, the infection can spread to vital organs and tissues such as the heart, lungs, and brain.

75.     Thus, patients with staph bacteremia must immediately be started on antibiotics.

76.     On September 29, 2022, Mr. Borkovec was arrested at a Broomfield Walgreens and transported to the Broomfield Detention Center ("Broomfield"), where he would remain as a pre-trial detainee for eight days.

77.     Shortly after he arrived, Turn Key LPN Chantel Trevizo received a detailed summary of Mr. Borkovec's encounter and treatment at Good Samaritan Hospital three days earlier, which she added to his Broomfield medical chart.

78.     The encounter summary showed that Mr. Borkovec had gone to the Emergency Department for abdominal pain and persistent vomiting early in the morning on September 26th and that he had been given IV fluids and medications prior to being discharged.

79.     The Good Samaritan encounter summary Ms. Trevizo received included Mr. Borkovec's elevated WBC, critical blood culture results, and recommended that he receive IV antibiotic therapy. It also included that as of September 26, 2022, his pulse, respiratory rate, and oxygen saturation were all normal.

80.     By the time Turn Key LPN Nely Moreno-Santacruz performed a medical and mental health intake screening at about 9:20 pm on the 29th, Mr. Borkovec was hypertensive and

had an abnormally elevated pulse rate of 120 beats per minute.

81. She was aware from the medical chart that Mr. Borkovec had staph bacteremia, and at the conclusion of the intake screening, Ms. Moreno-Santacruz notified Defendant Dr. Bryan Reichert of Mr. Borkovec's medical history and urine drug screen results.

82. Mr. Borkovec was started on an opiate withdrawal protocol, but Dr. Reichert did not give any other orders at that time.

83. Either Ms. Moreno-Santacruz recklessly chose not to relay Mr. Borkovec's abnormal vital signs and alarming lab results, or Dr. Reichert recklessly concluded that Mr. Borkovec's extremely elevated pulse and blood pressure had a benign cause without any hands-on assessment or even a chart review.

84. Mr. Borkovec continued to have elevated pulse rates throughout his incarceration at Broomfield.

85. On September 30th, Ms. Trevizo took Mr. Borkovec's pulse, which was elevated, at 114 bpm. When Ms. Trevizo called Dr. Reichert to relay this abnormal vital sign, he gave an order to start supportive mediations for opioid withdrawal, again recklessly deciding that Mr. Borkovec's pulse was elevated due to drug withdrawal without any hands-on assessment, chart review, or orders responsive to his known bacterial infection.

86. Mr. Borkovec's pulse was taken twice on October 1, 2022. At 11:08 am, LPN Moreno-Santacruz recorded his pulse as elevated, at 108 bpm. At 11:03 pm RN Jessica Hernandez charted that it was still elevated at 115 bpm.

87. The next day RN Hernandez recorded Mr. Borkovec's pulse as 107 bpm.

88. At 10:27 am on October 3rd, LPN Trevizo charted that Mr. Borkovec's pulse was

118 bpm.

89. All reasonable health care workers know that a continuously elevated pulse like this is often caused by infection. Still, none of these nurses conveyed Mr. Borkovec's abnormal vital signs to a provider.

90. Nurses cannot diagnose patients, or rule out serious medical conditions, or decide for themselves to withhold abnormal vital signs and symptoms like these from a provider. Doing so is a gross violation of the constitutional gatekeeper duty.

91. On the afternoon of October 3, 2022, Dr. Reichert performed a chronic care exam and finally acknowledged that Mr. Borkovec's recent labs included a white blood count of 17.77 K/uL and that two of his blood cultures were positive for staph bacteremia.

92. Despite knowing from earlier reports and charting that Mr. Borkovec was consistently experiencing abnormally high pulses, had an elevated WBC, and two positive blood cultures, Dr. Reichert did not take a single vital sign during this visit.

93. Even though Good Samaritan doctors expressly charted that staph aureus "is unlikely to be a contaminant in 2 bottles," and Mr. Borkovec's elevated white blood count indicated he had a significant infection, Dr. Reichert baselessly concluded that the blood cultures were contaminated, and that Mr. Borkovec was not experiencing "true bacteremia."

94. Defendant Reichert knows that it is impossible to rule out proven bacteremia on lab tests without any further testing, and that when it comes to bacteremia and sepsis, time is of the essence. He nonetheless chose to ignore the obvious danger posed by Mr. Borkovec's lab results and deprive him of the benefit of a diagnosis.

95. Despite actively knowing that Mr. Borkovec's blood cultures were positive for

staph bacteria, Dr. Reichert ordered a routine repeat CBC and charted that medical staff should "consider repeat blood cultures if WBC remains elevated."

96.     He did not order the repeat bloodwork STAT or start empiric antibiotics despite knowing that the bacteria in Mr. Borkovec's bloodstream would continue to replicate without treatment, and that the longer the delay in administering antibiotics and IV fluids, the less likely it is a patient like Mr. Borkovec can make a complete recovery.

97.     Rather than immediately starting the antibiotics and IV fluids Mr. Borkovec so obviously needed, or sending him out to a hospital where he could timely receive such care, Dr. Reichert charted medical staff should further delay treatment and just "monitor for any signs of infection/sepsis for which he will need to be sent to the ER given recent positive blood cultures."

98.     Dr. Reichert did not even bother to specify what "signs of infection/sepsis" medical staff should monitor for, or start any protocols that would ensure Mr. Borkovec would be assessed at any particular interval.

99.     Dr. Reichert also did not inquire about possible sources of infection, examine Mr. Borkovec's skin for potential sources, or order any further tests or assessment that could reveal a source such as imaging, urine test, or dental exam.

100.    Dr. Reichert was consciously aware that at the time he ordered monitoring only that Mr. Borkovec already had multiple "signs of infection/sepsis," including an extremely elevated WBC, two positive blood cultures, a consistently abnormally elevated heart rate, and that Mr. Borkovec needed immediate antibiotic treatment for progressing bacteremia.

101.    Thus, Dr. Reichert admittedly already knew that Mr. Borkovec needed to go to the emergency room, but chose to deny that care.

102.     Mr. Borkovec's signs and symptoms of infection continued, and his pulse remained consistently abnormally high for the remainder of his incarceration at Broomfield.

103.     On October 4, 2022, Ms. Trevizo charted that his pulse was 118 bpm at 12:25 pm, and Ms. Moreno-Santacruz charted it was 105 bpm at 9:41 pm.

104.     On October 6th, Ms. Trevizo recorded Mr. Borkovec's pulse rate as 108 bpm.

105.     Mr. Borkovec was not sent to the ER even after Dr. Reichert's exam and instruction, despite his continuing abnormally high pulses, which were a clear sign of infection/sepsis, and of which Dr. Reichert was aware.

106.     The repeat CBC never happened. It was initially scheduled for October 6, 2022, but on the morning of the 6th, Ms. Trevizo "rescheduled" the appointment.

107.     At approximately 10:30 am on October 7th, Broomfield transferred Mr. Borkovec to Boulder County Jail due to population issues at the Broomfield Detention Center.

108.     Despite being consciously aware that Mr. Borkovec had an elevated WBC, positive blood cultures, a persistently high pulse, ongoing signs of infection, and incomplete labs, Turn Key workers did not take any steps to inform medical staff at Boulder about Mr. Borkovec's known health status and serious medical needs.

109.     Turn Key workers' conscious choice not to convey this information to Boulder was a complete and total dereliction of their gatekeeping duties. They simply handed off this known-to-be seriously ill patient without any regard for his future care needs, despite knowing that without antibiotic treatment he was likely to develop sepsis and suffer serious injury or death.

110.     Two hours after Mr. Borkovec was transferred, Ms. Trevizo falsely charted that the repeat CBC was completed.

111.    During the intake medical screening at Boulder, Mr. Borkovec told Defendant RN Alexis Henderson that he previously used heroin intravenously four times daily and that his last use was two weeks ago.

112.    He reported that he did not have any ulcers, breathing problems, or dental problems.

113.    He informed RN Henderson that he had been in the Broomfield Detention Center for the last eight days, that he had chronic pain in his back, knee, and neck, and that he recently visited Good Samaritan Hospital for gastroparesis (a condition that prevents proper stomach emptying) and cyclic vomiting.

114.    Despite being informed by Mr. Borkovec that he was a recent IV drug user, had several chronic health problems, had been in Broomfield for a week, and had recently been seen at Good Samaritan, Boulder health care workers did not take any steps to obtain care summaries or other continuity of care documents from either facility. They did not even ask Mr. Borkovec to sign a Release of Information.

115.    RN Henderson instead just told Mr. Borkovec to submit a written request for medical care ("kite") if needed.

116.    The next day, October 8, 2022, Mr. Borkovec submitted a kite requesting Tylenol for back pain and digestion issues.

117.    In response, without any assessment of Mr. Borkovec, RN Henderson authorized Naproxen twice daily for chronic pain.

118.    Mr. Borkovec submitted another kite requesting medication for indigestion on October 11th. Defendant RN Tiffany Jones started Mr. Borkovec on Tums/Maalox three times daily as needed. She did not perform a hands-on assessment, take Mr. Borkovec's vital signs, or

otherwise consider the cause of Mr. Borkovec's digestive issues.

119. On October 12th, Mr. Borkovec submitted another kite, this time requesting a muscle relaxer because Tylenol and NSAIDs were not helping the pain in his back and body.

120. Defendant RN Deyanira Martinez responded to this kite by talking to Mr. Borkovec about his generalized pain that was not managed with Tylenol and NSAIDs while she was at his housing unit distributing medications ("med pass").

121. Without consulting a provider, or even performing a nursing assessment, Ms. Martinez concluded that Mr. Borkovec was faking or exaggerating his pain, charting that he was seen walking down the stairs without difficulty, with steady gait and erect posture. She recklessly concluded that Mr. Borkovec was not in acute distress and disregarded his complaints as fake or non-serious.

122. All reasonable healthcare workers know that severe back pain and generalized body pain are symptoms that may be related to a serious medical condition, particularly in an IV drug user, and must be timely evaluated by a provider qualified to diagnose the cause of these symptoms.

123. Because nurses are not qualified to diagnose, concluding the cause of a symptom to be benign or fake is dangerous and constitutes practicing outside the scope of licensure. Concluding serious symptoms to be faked or benign can only be done by a provider after ruling out legitimate medical causes for symptoms, as 'malingering' is a diagnosis of exclusion.

124. Just days later, on October 15th, Mr. Borkovec submitted another kite complaining of insomnia and body pain still so severe that it was not adequately controlled with twice daily NSAIDs, writing:

NATURE OF REQUEST//NATURALEZA DE PETICION: *medical*

PLEASE DESCRIBE THE SPECIFIC REQUEST//FAVOR DE DESCRIBIR SU PETCION ESPECIFICAMENTE:

*need tramadol or more nsaid for pain in body, 1 nsaid isn't enough. if possible mix w/ muscle relaxers or melatonin for sleep at night.*

125.     Mr. Borkovec submitted at least five kites the very next day, on October 16, 2022, describing a deeply concerning constellation of symptoms, including vomiting and "extreme tooth ache causing pain and migraine, tightness in back and insomnia causing lack of sleep. Depression and anxiety getting worse."

126.     All reasonable health care workers are aware that toothaches are frequently caused by an abscess or other oral infection, and that because IV drug users are already predisposed to infective endocarditis, dental infection poses an especial risk to them.

127.     All reasonable health care workers know that leaving a tooth abscess untreated can lead to life-threatening complications, including endocarditis and sepsis.

128.     Any reasonably trained health care worker is aware that new onset "extreme" dental pain, especially in combination with severe back tightness and pain, severe diffuse body pain, vomiting, insomnia, and anxiety, particularly in a recent IV drug user, are signs that an illness has a systemic component likely caused by bacteria.

129.     These are also well understood symptoms of endocarditis and sepsis – the treatable infections that ultimately killed Mr. Borkovec.

130.     This dangerous combination of symptoms Mr. Borkovec was displaying required, at the very minimum, an immediate and complete nursing assessment and doctor evaluation.

131.     Rather than refer Mr. Borkovec for the provider evaluation he needed, Dental

Assistant Mel Parker responded, "please kite separately for medical and mental health concerns," and Defendant Nurse Kaela Seeburger unilaterally concluded Mr. Borkovec's vomiting, insomnia, and body pain could go unaddressed, flatly rejecting his requests without assessment, writing only:



RESPONSE TO REQUEST: Not approved for a diet change.

☐ CHECK THIS BOX IF YOU ARE CONTINUING ON ANOTHER PAGE.

SIGNATURE: 1652        DATE: 10/16/22



RESPONSE TO REQUEST: Kite mental health for Melatonin. Not approved for Tramadol.

☐ CHECK THIS BOX IF YOU ARE CONTINUING ON ANOTHER PAGE.

SIGNATURE: 1652        DATE: 10/16/22

DISTRIBUTION OF THIS FORM:    WHITE: INMATE FILE        Yellow: COPY TO INMATE WHEN        PINK: COPY TO INMATE WHEN
                                                         REQUEST RESOLVED                    REQUEST TURNED IN

132.    Without ever seeing or speaking to Mr. Borkovec, Nurse Seeburger callously disregarded his complaints of severe and worsening body pain, insomnia, and vomiting as benign.

133.    Like Ms. Henderson and Ms. Martinez, Nurse Seeburger acted recklessly outside her scope when she concluded without any provider involvement, or even a hands-on nursing assessment, that Mr. Borkovec's new and worsening generalized body pain was nothing to be concerned about.

134.    Faced with this potentially dangerous constellation of complaints, she did not take any vital signs or ask any questions about the type, severity, or duration of Mr. Borkovec's symptoms. She did not make any attempt to have him seen by a provider who could diagnose the cause of these concerning symptoms. She instead decided baselessly and unilaterally that the underlying cause of Mr. Borkovec's symptoms was nothing serious.

135.     The next day, October 17, 2022, Mr. Borkovec submitted a kite to mental health as directed, complaining that he hadn't been able to sleep in 3-4 days and needed melatonin.

136.     He also submitted another kite complaining that he was experiencing dental pain so extreme that it was causing migraines:



137.     Again, Defendant RN Jack Markling did not attempt to determine the cause of Mr. Borkovec's new and severe dental pain, perform a nursing assessment, take vital signs, or ask Mr. Borkovec any questions.

138.     Despite being expressly authorized by Boulder policy to start treating dental pain and infection without a dentist's involvement or send a patient with a serious dental infection to the emergency room, Mr. Markling took no steps to determine whether Mr. Borkovec had an infection or abscess.

139.     Rather, he simply responded that Mr. Borkovec could have Tylenol twice a day, in addition to the Naproxen he was already receiving.

140.     Defendant Markling knew that over-the-counter pain medications like Tylenol and Naproxen could not treat, let alone cure, a tooth abscess or any other type of infection.

141.     Dental Assistant Mel Parker also responded to this kite, writing that Mr. Borkovec had been "referred to dental."

142.     Despite knowing that Mr. Borkovec had been complaining of extreme tooth pain

and migraines for two days, Ms. Parker did not take any steps to rule out infection or to ensure that Mr. Borkovec be seen urgently. There is no record that he was ever seen by a dentist before his death three weeks later.

143.    On October 18, 2022, Mr. Borkovec submitted two more kites – one describing that his depression and anxiety were getting significantly worse, and another that read: "I've lost a lot of weight from not being able to eat the normal meals. Could I get Ensure or an [alternative] to help supplement my diet. A lot of the food makes my gastroparesis worse. Will sign ROI for medical paperwork for proof."

144.    RN Tiffany Jones responded by placing Mr. Borkovec on weekly weight checks for a month.

145.    She did not weigh him or gather any other information about the cause or severity of his weight loss. As with each health care worker responding to a kite before her, Ms. Jones did not perform a hands-on nursing assessment, take Mr. Borkovec's vital signs, or refer him to a provider capable of diagnosing the cause of his mounting serious symptoms.

146.    She also did not take him up on his offer to sign a release of information, which would have revealed that Mr. Borkovec's constellation of symptoms were caused by progressing staph bacteremia that could be treated with antibiotics.

147.    Mr. Borkovec submitted yet another kite on October 21st, complaining that he "came down with [a] cold before transfer to inmate worker, makes me fatigued and sore."

148.    In response, he was given a rapid COVID test, which came back negative.

149.    Regardless of what Mr. Borkovec thought was the cause, he had conveyed obviously serious symptoms which required emergent treatment beyond the jail's capabilities, and

nobody performed an assessment.

150.    Without any assessment or provider consultation, health care worker Blake Morrow authorized Mr. Borkovec to have Mucinex twice daily for five days. He noted that Mr. Borkovec was already on Tylenol and an antihistamine but took no further steps to learn what was causing Mr. Borkovec's breakthrough soreness, fatigue, and other serious symptoms.

151.    By October 21, 2022, Mr. Borkovec had reported to Boulder health care workers that he was a recent IV drug user who was experiencing severe back pain and tightness, severe diffuse body pain and soreness, ongoing inability to sleep, vomiting, extreme tooth pain, migraines, anxiety, significant weight loss, and fatigue.

152.    Although he was submitting kites almost every day, nobody had performed a hands-on assessment or taken his vital signs since his intake assessment on October 7th.

153.    No one tried to learn about his medical history and condition by requesting records from Broomfield Detention Center or Good Samaritan Hospital.

154.    All of the responding nurses reviewed his earlier kites and complaints, and therefore understood the critical cumulative picture. They knew that he did not have COVID, and that something else was causing a serious, systemic response and illness but did not escalate his requests for medical attention to a higher-level provider.

155.    This constellation of symptoms would place endocarditis, bacteremia, and sepsis at the top of any reasonably trained health care provider's list of differential diagnoses, but none of the Boulder nursing staff referred Mr. Borkovec to a provider capable of diagnosing the cause of his concerning symptoms.

156.    Rather, they each independently and baselessly concluded that the cause of his

symptoms was benign or faked, and continued to blindly administer an ever-growing cocktail of ineffectual over-the-counter drugs that did nothing to treat the underlying cause of Mr. Borkovec's obviously systemic and worsening illness.

157.    By October 24, 2022, Mr. Borkovec was too sick and weak to work. Accordingly, Boulder staff determined that his serious health problems prevented him from working and moved him out of the "inmate worker" pod, to the Medium-B Module, a more restrictive housing unit.

158.    Apparently, Mr. Borkovec was to be housed there indefinitely due to his obvious illness.

159.    All health care workers know that it is a serious change in condition to go from being able to work to being too sick to leave the housing unit and that such a drastic change in condition requires an evaluation by a provider who can diagnose the cause.

160.    By the time he arrived in the Medium-B Module on the afternoon of October 24th, Mr. Borkovec "looked half dead already."

161.    He was noticeably skinny, lethargic, unable to eat, and his skin was pale and jaundiced. He was regularly coughing up and vomiting blood.

162.    Boulder nurses were seeing Mr. Borkovec at med pass every day, often several times a day. He reportedly routinely asked nurses to send him to the hospital for medical care and told them that he was spitting up blood.

163.    Mr. Borkovec also repeatedly asked the deputies working in Medium-B for medical attention himself and through other inmates.

164.    It was obvious to inmates with no medical training that by the time he arrived in Medium-B, Mr. Borkovec's health had deteriorated to the point that he needed to be immediately

hospitalized.

165.    Inmates regularly told both deputies and medical staff that it was obvious something was seriously medically wrong with Mr. Borkovec and that he needed to go to the hospital.

166.    Although he was seeing Boulder health care workers daily at med pass, routinely asking to be sent to the hospital, and reporting a multitude of serious symptoms verbally and in writing, Boulder health care workers continued to disregard Mr. Borkovec's complaints as benign and faked.

167.    They did not escalate his care to a provider or advocate for him to be urgently sent to the emergency room, in complete dereliction of their gatekeeping duties.

168.    They did not even take his vital signs. Boulder nurses simply looked on as Mr. Borkovec continued to deteriorate.

169.    Mr. Borkovec submitted another kite to medical on October 25, 2022, again complaining of persistent vomiting, writing: "normal food is making me sick and puke. Any help is appreciated."

170.    Although he reported that he had gastroparesis during his intake screening and had been reporting persistent vomiting and weight loss for more than a week, Defendant Nurse Shonda High callously, and without any assessment or provider input denied his plea for help, writing:



171.    On October 27, 2022 Mr. Borkovec called his great grandmother and told her that he had been transferred out of the inmate worker pod because he was too sick to work. He knew and conveyed that there was fluid in his lungs.

172.    He was very fatigued and needed to lay down after about eight minutes on the phone.

173.    Mr. Borkovec submitted another kite on October 27th complaining that he was "still sick," and had a persistent cough that was keeping him up at night.

174.    Finally, Defendant NP Jennifer Samuels took Mr. Borkovec's vital signs or directed them to be taken.

175.    His oxygen saturation was abnormally low at 93% and his pulse was extremely elevated at 137 bpm.

176.    All reasonably trained health care providers know that a significantly high pulse, particularly when combined with low blood oxygen saturation, is a danger sign of a lung infection and that high pulses are indicative of sepsis and septic shock.

177.    NP Samuels did not obtain a respiratory rate even though Mr. Borkovec was complaining of respiratory issues and not maintaining normal blood oxygen saturations, and despite knowing full well that tachycardia (fast heart rate) and tachypnea (abnormally rapid breathing) are sensitive and specific signs in predicting serious bacterial infections.

178.    Despite obtaining two abnormal vitals, including an extremely high heart rate, NP Samuels charted that Mr. Borkovec was not experiencing any acute distress.

179.    She did not order any diagnostic tests or follow up care to determine what was causing these abnormal vital signs. Her only order was for Mr. Borkovec to receive a decongestant, Tylenol, and cough syrup for five more days.

180.    When NP Samuels decided not to order any diagnostic testing, or even a period of observation, despite obtaining an extremely elevated pulse of 137 combined with a low pulse ox, she knew from earlier charting that Mr. Borkovec had been complaining of severe back pain and tightness, severe diffuse body pain and soreness, ongoing inability to sleep, vomiting, extreme tooth pain, migraines, anxiety, significant weight loss, and fatigue for weeks.

181.    She knew he was a recent IV drug user at high risk of contracting a blood-borne infection, that he was pale, coughing, and unable to eat. She also likely knew he was coughing up blood as he was telling inmates and nurses with whom she worked.

182.    NP Samuels knew that the over-the-counter medications she prescribed could never treat, let alone cure, any underlying condition for these serious symptoms.

183.    Mr. Borkovec continued to visibly deteriorate over the next four days. He was lethargic, weak, and hardly leaving bed.

184.    It was obvious to other inmates that he was in pain and struggling to walk, particularly on the stairs. He moved slowly and was hunched over.

185.    He was trying to drink water, but couldn't eat and was obviously losing weight.

186.    He was feverish, sweaty, coughing, frail, and struggling even to talk because it hurt so much to breathe.

187.    Everyone could see how pale and seriously ill he was.

188.    Mr. Borkovec spat the thick, chunky, blood he was coughing up into two milk cartons he kept near his bed.

189.    He was obviously struggling to breathe. Other inmates noticed that he was wheezing and breathing slowly. He made audible gurgling sounds when he breathed – a clear and

objective sign that his lungs were full of fluid.

190.    He still walked to med pass three times a day and kept asking nurses to please send him to the hospital for the higher-level care he obviously needed.

191.    By November 1, 2022, Mr. Borkovec developed dark black circles under his eyes.

192.    An inmate trustee in the unit saw Mr. Borkovec waiting in the day room to take his medications and asked if he was ok because he was worryingly pale and "did not look good."

193.    Mr. Borkovec told him that he had fallen off the top bunk in his cell. The trustee thought that he may have broken a rib because he was "breathing shallow" and rapidly. He thought that Mr. Borkovec "probably had internal bleeding or something," and advised Mr. Borkovec to talk to a nurse.

194.    The trustee expected the nurses "would do something" for Mr. Borkovec. It "seemed like common sense to him because Mr. Borkovec did not look well."

195.    It was obvious to many lay people that Mr. Borkovec was gravely ill and needed emergent medical care beyond what the Jail could provide. He continued to ask nurses for the higher acuity care he needed but was never sent to the hospital.

196.    Throughout the day on November 2nd, Mr. Borkovec begged deputies to get him medical care but received none.

197.    He continued to deteriorate, and at approximately 11:30 pm he was so obviously in the throes of a medical emergency that inmates who were passing by his door looked in and called for deputies to help.

198.    Mr. Borkovec told the responding deputies that he was experiencing shortness of breath, and they called for medical to come to his cell.

199.     Defendant Nurse High entered Mr. Borkovec's cell at 11:36 pm. She spent less than four minutes with him before determining she needed "a second opinion on her nursing assessment of this patient," and summoned Defendant RN Deyanira Martinez.

200.     At 11:41 pm, Ms. High left the Medium-B Module. She did not return with Ms. Martinez to jointly assess Mr. Borkovec, contact a provider, or even enter a note about the nursing assessment she purportedly performed.

201.     Ms. Martinez entered Mr. Borkovec's cell at 11:49 pm. He was very pale and reported that he was short of breath and had a history of asthma.

202.     At that time, Mr. Borkovec's oxygen saturation levels were critically low at 88% on room air.

203.     All reasonably trained health care workers are aware that it is an emergent symptom for a patient not to be able to maintain oxygen saturation in his blood.

204.     Any reasonably trained health care worker knows that a patient with an oxygen saturation of 88% and an unknown cause must immediately be transported to an emergency room for higher level assessment and care than can be provided at the Boulder County Jail.

205.     Despite having obtained a critically low oxygen saturation, Nurse Martinez did not take a full set of vital signs. She purposefully did not take Mr. Borkovec's temperature or obtain a respiratory rate – two vital signs that clearly indicate a person is experiencing a serious infection and/or sepsis.

206.     She callously asked this patient who was known to be too ill to leave his cell if he had engaged in any vigorous activity, and directed him to take slow, deep breaths.

207.     Mr. Borkovec followed her direction, and after several slow, deep breaths his

30

oxygen saturation rose to 92% – a still abnormally low vital sign that requires immediate provider evaluation.

208.    Ms. Martinez baselessly and unilaterally determined that the most benign possibility, asthma, was causing Mr. Borkovec's symptoms, and, at 11:51 pm, left his cell to retrieve a rescue inhaler.

209.    She returned one minute later, gave Mr. Borkovec the inhaler, and left.

210.    She did not listen to his lung sounds, obtain an EKG, stay with her patient to monitor whether the inhaler helped his symptoms, re-take his oxygen saturation, or take any other steps to determine whether the treatment she unilaterally determined was appropriate actually worked.

211.    Ms. Martinez spent less than three minutes with Mr. Borkovec.

212.    She placed a referral for Defendant Dr. Charles Robert Davis, requesting that Mr. Borkovec be allowed a rescue inhaler and have his oxygen saturation checked for the next three days.

213.    Dr. Davis outrageously accepted Ms. Martinez's erroneous and simplistic conclusion that Mr. Borkovec's symptoms were caused by asthma without performing an evaluation of his own, asking for any information about Mr. Borkovec's lung sounds, inquiring about his response to the rescue inhaler, or even receiving a full set of vital signs.

214.    Either Dr. Davis did not perform a chart review before concurring with Ms. Martinez's medical "diagnosis," or he decided that Mr. Borkovec should go without anything more than an inhaler while knowing that he was a recent IV drug user who had been experiencing severe back pain and tightness, severe pain and soreness throughout his body, inability to sleep, persistent

vomiting, coughing, extreme tooth pain, migraines, anxiety, significant weight loss, and fatigue for weeks, and that NP Samuels obtained an extremely elevated pulse of 137 and a low blood oxygen saturation a week prior.

215.    Defendants High, Martinez and Davis completely abdicated their role as gatekeepers and recklessly did not hospitalize Mr. Borkovec. They did this despite knowing they had done nothing to rule out serious causes for his abnormal vitals and medical symptoms. They did this knowing that they could not treat Mr. Borkovec, who clearly required evaluation and treatment that was outside of the jail's ability. They did this knowing that Mr. Borkovec was at serious risk of bodily injury or death without assessment and treatment.

216.    Moments after Nurse Martinez left, Mr. Borkovec was moved to cell #5, where he would be housed alone for the rest of his life.

217.    Given his obviously serious medical condition, Mr. Borkovec clearly required urgent assessment and transfer to the emergency room where his condition could be diagnosed and treated. Instead, Boulder staff moved him to a cell alone – depriving him of access to the other inmates – the only people trying to help him.

218.    At 9:02 am on November 3rd, nine hours after he was moved to cell #5, Sergeant Dave Nagel "checked" on Mr. Borkovec. He spent *one second* looking in his cell before moving on.

219.    A minute later, at 9:03 am, Mr. Borkovec stumbled out of his cell, weak, coughing, and "keeled over at the waist," as shown below:



220.    It was obvious that he needed emergent medical attention, and an inmate who happened to be passing by stopped to ask Mr. Borkovec if he was okay.

221.    Within 30 seconds Mr. Borkovec collapsed. The passerby immediately summoned deputies to help him and waited by his side until they arrived.

222.    When Deputy Gerardo Wence and Sgt. Nagel arrived at the cell, Mr. Borkovec was obviously on the brink of death. He was ghost white, unable to sit up, barely able to talk, and moaning in pain:



223.    He was audibly struggling to breathe, and Deputy Wence was aware that he had been seen by medical the night before for shortness of breath.

224.    Even though Deputy Wence and Sergeant Nagle could see and hear that Mr. Borkovec could barely speak and was obviously experiencing a medical emergency, they refused to immediately summon medical workers, instead waiting until they got a verbal report of shortness of breath from Mr. Borkovec.

225.    When Mr. Borkovec was finally able to verbally convey that he was short of breath, Deputy Wence still did not call for an emergency response, but rather called for a "code 4" nonemergent medical response.

226.    Mr. Borkovec's lips and mouth were covered in black coffee grounds emesis, and he was completely unable to talk within minutes – although he attempted to respond to questions with grunts and moans.

227.    When other security staff arrived, it was immediately apparent to them that this was a serious medical emergency. They decided to get a crash cart and radioed for medical to "step it up please, and bring Narcan."

228.    While they were waiting for medical to arrive, deputies repeatedly outrageously accused Mr. Borkovec causing his own emergent condition by taking drugs.

229.    They downplayed and mocked the severity of the situation, telling Mr. Borkovec, "let's not make a mess," and asking, "is this just…you used chew and now you're all messed up?"

230.    Deputy Wence minimized Mr. Borkovec's grave physical appearance, telling others that he was pale the day before, "this is kind of his normal skin tone," and "he must have taken something just right now."

231.     Mr. Borkovec had not taken any drugs or overdosed, and there was no reason to think that he had, as medical workers were aware.

232.     When RN Henderson arrived, she immediately "stated something around the words of 'his pupils are so big. I don't know if this is an overdose.'"

233.     The fact that Mr. Borkovec's pupils were notably dilated was an obvious indication that he was not experiencing an opioid overdose.

234.     Medical workers and security staff nonetheless continued treating Mr. Borkovec as if he were overdosing, administering him four doses of Narcan and refusing to consider any other possible causes of this acute medical emergency despite his documented complaints of various serious symptoms for nearly a month prior.

235.     When Nurse Henderson administered the first dose of Narcan, Mr. Borkovec was awake and breathing. His skin was cold to the touch, but he was looking around and trying to answer questions.

236.     His breathing rapidly dropped to 12 breaths per minute, and his oxygen saturation was only 70%. Shortly thereafter Mr. Borkovec lost consciousness and began profusely vomiting dark red and black blood, including golf ball sized blood clots.

237.     Nurses and deputies moved Mr. Borkovec out of cell #5 and began CPR, but it was too late. There was frank red blood coming out of Mr. Borkovec's nose, mouth, and eyes. When first responders arrived, they were not able to get a pulse back.

238.     When Sgt. Nagle called to request investigators respond to the jail, he outrageously said: "Do you know if the ops supervisor was contacted about the in-custody 'incident'? I don't know if he's dead yet but…we had some guy OD."

239.     Nearly three weeks had passed since Mr. Borkovec first requested medical care for his "extreme tooth ache," but he still had not received any dental exam or antibiotics.

240.     He had been at the Boulder County Jail for 26 days and 17 hours. In that time, he had reported: recent IV drug use, severe back pain and tightness, severe pain and soreness throughout his body, inability to sleep, vomiting, coughing, extreme tooth pain, migraines, anxiety, significant weight loss, and fatigue for weeks.

241.     Mr. Borkovec was so obviously sick throughout his time at Boulder that medically untrained laypeople were aware he needed hospital-level emergent care. He was concerningly pale, jaundiced, thin, lethargic, and frail. He was coughing up blood, barely eating, and obviously struggling to breathe. Other inmates had been collecting his meal trays, summoning deputies to get him medical attention, and telling Boulder staff he obviously needed to go to the hospital.

242.     NP Samuels and Nurse Martinez had both obtained abnormal vital signs a week apart, including a critically high pulse of 137, and a critically low oxygen saturation of 88%. Mr. Borkovec had been complaining of shortness of breath and begging to go to the hospital since at least the previous day, but his complaints fell on deaf and deliberately indifferent ears.

243.     The extent and severity of this bacterial infection was immediately obvious to Boulder County Coroner and Forensic Pathologist, Dr. Meredith Frank. Before she even started Mr. Borkovec's autopsy on November 4, 2022, she advised the deputies in attendance to wear face masks because Mr. Borkovec "appeared to be very sick."

244.     On autopsy, Dr. Frank found that Mr. Borkovec's blood and lungs contained staph bacteria. His heart was covered in lesions from the infectious vegetative endocarditis that was allowed to progress for weeks without treatment.

245. His lungs were so infected and filled with bloody fluid that the right weighed 1275 grams, and the left 1450 grams, both more than double the weight of a normal post-mortem lung, which should be between 400 and 600 grams.

246. He had ulcers throughout his gastrointestinal system, and he had experienced an acute upper gastrointestinal hemorrhage.

247. Mr. Borkovec was just 22 years old when he suffered an entirely preventable, protracted, and excruciatingly painful death from untreated sepsis due staph bacteremia and infectious vegetative endocarditis at the Boulder County Jail.



**Allegations Relating to Broomfield Entity Defendants' *Monell* Liability**

248. At all times relevant hereto, the City and County of Broomfield contracted with Turn Key to provide medical care and services to detainees and inmates at the Broomfield Detention Center.

249. Defendants Turn Key and Broomfield maintain unconstitutional customs, practices, and policies, including: (1) disregarding and minimizing inmates' medical complaints; (2)

delaying or denying indicated testing and treatment; (3) failing to timely send patients to the hospital; (4) understaffing; (5) using nurses to practice medicine recklessly outside their scope; and (6) transferring patients without necessary continuity of care records.

250.    Each of the Individual Turn Key Defendants violated Mr. Borkovec's Fourteenth Amendment right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner – disregarding abnormal signs, symptoms, and labs; and failing to refer him for higher level evaluation and treatment despite knowing that failing to do so put him at significant risk of serious illness or death. This pattern, standing alone, evinces the Turn Key's custom, policy, or practice of deliberate indifference. *See, e.g., Davies v. Israel*, 342 F. Supp. 3d 1308 (S.D. Fla. 2018) ("Plaintiff alleges that each Defendant played a different role in tending to Plaintiff when he was unconscious and bleeding but nonetheless disregarded that serious risk by failing to facilitate Plaintiff's immediate emergency transfer to a hospital by, for example, calling 911. In this way, Defendants each participated in delaying necessary treatment for no apparent medical reason, which may constitute deliberate indifference.").

251.    Turn Key had financial incentives not to order labs STAT, or at all, not to medicate patients, and not to send patients to an outside health care provider when indicated.

252.    Indeed, Turn Key emphasized repeatedly in its 2020 bid for the Broomfield Detention Center inmate medical services contract that it would reduce costs by reducing offsite care, and assumed financial responsibility for the costs associated with laboratory services, including STAT (immediate) testing, and all medications administered (with certain limited exceptions not applicable to the care at issue), when it won the contract.

253.    Before the City and County of Broomfield awarded Turn Key its inmate medical

services contract, there was a well-known widespread pattern and practice of deliberately indifferent medical care at Turn Key facilities.

254.    Because Defendant Turn Key is a large company with a shameful record of providing constitutionally inadequate medical care at institutions across the Oklahoma-Arkansas region, there are a plethora of examples from other facilities demonstrating Turn Key's culture, custom, policy, and practice of deliberate indifference to the serious medical needs of their prisoner-patients. For example:

255.    In 2009 Lacee Danielle Marez was booked into the Cleveland County Jail in 2009 for missing a court appearance. During a tussle with jail staff Ms. Marez, only 21 years old, struck her head on a concrete floor and suffered a traumatic brain injury. Over the next several days Ms. Marez repeatedly asked for medical treatment, began vomiting, urinating on herself, and laying lethargic in her bed. ESW Correctional Healthcare (a previous iteration of Turn Key Health Clinics, LLC) staff ignored Ms. Marez's requests for medical attention and obviously serious symptoms. Rather, jail staff abandoned Ms. Marez in a holding cell for three days, where she slipped into a coma and suffered a heart attack. Ms. Marez lived in a vegetative state for several years but eventually passed away. In 2014, Turn Key paid a confidential amount to settle a federal civil rights lawsuit related to the incident.

256.    Curtis Gene Pruett was only 36 years old when he died in a holding cell at Cleveland County Jail in October 2011 after staff ignored his repeated pleas for emergency medical attention. Mr. Pruett told medical staff that he had high blood pressure and was in severe pain. Surveillance video showed Mr. Pruett doubled over and clutching his chest, but rather than assess Mr. Pruett or refer him to a higher-level caregiver, a nurse accused Mr. Pruett of faking his condition. Mr. Pruett

subsequently died of a heart attack. Turn Key settled a lawsuit related to the incident in 2014.

257.    While detained at the Cleveland County Detention Center in November of 2014, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery. He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection," and underwent emergency brain surgery. Mr. Autry underwent a series of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe. Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

258.    In June 2016, Turn Key medical staff at Garfield County, Oklahoma Jail did nothing to intervene while Anthony Huff, who was experiencing delusions and hallucinations, was kept in a restraint chair for more than 55 hours. Mr. Huff was ultimately found unresponsive in the chair and pronounced dead. After a federal wrongful death lawsuit was filed on Mr. Huff's behalf, two Turn Key nurses and various jail staff were each charged with felony second-degree manslaughter. In October 2019, Garfield County paid $12.5 million to settle the case, to which Turn Key contributed a confidential amount.

259.    Anthony Kade Davis also died in June 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. In the days leading up to his death Mr. Davis was screaming, shouting that he was in pain, and pleading for assistance. He was known to be ill and experiencing serious and dangerous symptoms including black, foul-smelling feces that had the appearance of coffee grounds. Despite knowing of these serious symptoms, Turn Key medical staff did not assess Mr. Davis or perform any diagnostic tests to determine the cause. A federal civil rights lawsuit arising from Mr. Davis's death was filed in 2017.

260.    Michael Edwin Smith became permanently paralyzed in the Muskogee County Jail in the summer of 2016 when Turn Key staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Mr. Smith had cancer, which spread to his spine, causing a dangerous spinal compression – a condition that can cause permanent paralysis if untreated. When he told the Turn Key-employed physician at the jail that he was paralyzed, the doctor laughed at Mr. Smith and told him he was faking. For a week before he was able to bond out of the jail, Mr. Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He lay in his own urine and feces because the jail staff accused Mr. Smith of faking paralysis and refused to help him. Turn Key settled a lawsuit arising from the incident in 2018.

261.    On August 28, 2016, Andrew Bowen arrived at the Greene County Jail having been severely beaten by the arresting Greene County Sheriff's Deputy. He was bleeding from the head, unconscious, and exhibiting agonal breathing/loud snoring – a clear indicator of severe head and brain injury. While jail staff laughed at Mr. Bowen, a Turn Key nurse attempted to awaken Mr.

Bowen without success. Despite recognizing that Mr. Bowen needed emergency medical care, and that she was not equipped with the necessary equipment to assist Mr. Bowen in this medical emergency, the nurse did not provide any timely assessment or treatment, or arrange for Mr. Bowen's transfer. Rather, no ambulance was called until after jail employees cleaned the blood off him, changed him out of his blood-soaked clothes, and booked him into the jail. When he finally arrived at the hospital Mr. Bowen had a large hematoma on his forehead and a gaping laceration on his chin. He was unconscious, experiencing seizures, and had to be intubated due to respiratory failure. After a month in the hospital Mr. Bowen was released to a step-down facility, but never fully recovered from the severe brain injury and the delay in treatment he suffered. Turn Key settled a federal civil rights lawsuit arising from the incident in April 2019.

262.    Russell Ted Foutch died September 30, 2016, after staff at the Creek County Jail observed him foaming at the mouth and coughing up blood. Before his death, Mr. Foutch complained of shortness of breath, lost consciousness multiple times in front of jail staff, and reported coughing up blood. Other inmates and Mr. Foutch's family noticed that he was ill and asked that he receive treatment. Mr. Foutch laid in his cell and slowly died from complications related to pneumonia without ever receiving the medically appropriate treatment and care he so desperately and obviously needed to save his life.

263.    When James Buchanan was booked into the Muskogee County Jail in November 2016, he informed staff that he had been in a car accident and was suffering from broken ribs, a collapsed lung, and neck problems. He was nonetheless placed in a general population pod where, over the course of the next ten days, Mr. Buchanan became quadriplegic one limb at a time because a cervical epidural abscess was allowed to fester. Turn Key medical staff were aware that Mr.

Buchanan was experiencing sudden and expanding paralysis but did nothing, even after he lost the ability to feed and hydrate himself. Rather they looked on as other inmates helped Mr. Buchanan eat, drink, and use the toilet, and scheduled him for a visit with the doctor the following week. It was only when Mr. Buchanan was found lying in a puddle of his own urine, complaining of 10/10 pain nearly 11 days after the initial onset of his symptoms that he was finally sent to the hospital. Mr. Buchanan remained paralyzed and permanently disabled despite spinal surgery.

264.    On December 14, 2016, 41-year-old Sharon Lavette Alexander of Little Rock, Arkansas, died at Pulaski County Jail. She had been booked into custody the day before her death. When she was processed into the jail, her asthma inhaler was taken from her and not returned. An autopsy revealed acute exacerbation of asthma was the cause of her death. A federal wrongful death lawsuit was filed by Alexander's family in January 2018. In May 2019 the case settled for $425,000 – Pulaski County paid $50,000 and Turn Key paid $375,000 to the family.

265.    On January 9, 2017, Wesley Prince became disoriented and wandered off his jobsite as a result of acute symptoms associated with renal failure and the onset of respiratory failure due to pneumonia. Although he requested medical attention, he was arrested by Tulsa police on suspicion of public intoxication and booked into the David L. Moss Criminal Justice Center, a Turn Key facility. Over the next week Mr. Prince repeatedly asked for medical attention and became more and more disoriented but Turn Key medical staff did not perform any tests to determine the cause of Mr. Prince's disorientation, including drug testing. Instead, medical staff put Mr. Prince on an opiate withdrawal protocol without performing any testing, hands-on assessment, or diagnosis. Finally, on January 17, Turn Key medical staff diagnosed Mr. Prince with pneumonia and eventually sent him out to the hospital. The emergency department providers

determined that Mr. Prince was suffering from renal and respiratory failure, intubated him, and admitted him to the intensive care unit in critical condition where he underwent hemodialysis at least once a day for several days. A lawsuit arising from the incident was filed in 2018.

266.    On February 15, 2017, Trillus Smith died in the Pulaski County Regional Detention Facility from acute pneumonia and dehydration. In the two weeks preceding her death, Turn Key medical staff observed that Ms. Smith was becoming less oriented to reality, unable to communicate, lethargic, not eating or drinking, and that her eyes were rolling in her head. Several nurses collected dangerously abnormal vital signs including critically low blood pressures on February 13th and 14th. Ms. Smith's blood labs also indicated a life-threatening condition. Despite these critically abnormal vital signs and values, Ms. Smith was never assessed by a higher-level caregiver or transported to the hospital. Rather, she was left alone in her cell to die.

267.    On June 10, 2017, Ronald Garland was brought to the Creek County Detention Center, a Turn Key facility, on charges of driving under the influence. No intake medical screening was performed and Mr. Garland was placed in a housing unit. More than 12 hours later a nurse noted that a jail staff member alerted her Mr. Garland was "acting weird" in the housing unit. She assessed Mr. Garland shortly thereafter and noted he denied being under the influence of any drugs or alcohol, that he was unable to answer orientation questions, he was moaning and yelling, could not focus or sit still. She charted his vital signs as a range and noted that Mr. Garland needed a medical assessment ASAP as he was potentially detoxing. Two hours later, the same nurse noted that Mr. Garland was confused, experiencing active visual hallucinations, but non combative. Despite his obviously worsening condition, this nurse did not take any steps to provide Mr. Garland with care or determine the cause of his symptoms. Later that night, deputies moved Mr. Garland

to a restraint chair and shoved his head downward between his knees, putting extreme pressure on his chest and diaphragm, causing Mr. Garland to go limp. At the hospital, Mr. Garland was diagnosed with an anoxic brain injury from which he did not recover and subsequently passed away.

> In its Order denying Turn Key's Motion to Dismiss the Court emphasized:

> [nurse] Janes allegedly was aware that Garland was moaning, yelling, and banging on the cell door, suggesting that he was in some discomfort. The pleading also alleges facts from which the court may infer that Janes subjectively knew that Garland's condition was deteriorating—specifically, that, at nine o'clock, Garland experienced symptoms of visual hallucinations and confusion that were not documented at the six o'clock hour. Finally, the Second Amended Complaint alleges that '[a]t no point did Janes . . . take any steps to provide [Garland] with any care despite the severe risk from unscreened detoxification, and despite actual knowledge that [Garland's] condition was worsening.' Taking these allegations as true and viewing them in the light most favorable to plaintiff, the Second Amended Complaint includes plausible allegations from which the court may infer that Janes knew of the risk that Garland's condition was worsening, resulting in increasingly severe symptoms, and chose to disregard it. Thus, the Second Amended Complaint states a plausible claim that Janes acted with deliberate indifference to Gardner's serious medical needs by recklessly failing to treat Garland properly.

*Bush v. Bowling*, No. 19-CV-00098-GKF-FHM, 2020 U.S. Dist. LEXIS 8495, at *16-17 (N.D. Okla. Jan. 17, 2020). A lawsuit regarding Mr. Garland's death settled in 2021 when Creek County paid Mr. Garland's Estate $750,000 and Turn Key paid an additional confidential amount.

268.    On August 20, 2017, Rebecca Royston was booked into the Bryan County Detention Center without an intake medical screening even though deputies observed her being unsteady on her feet and believed her to be highly intoxicated. Despite suspecting that Ms. Royston was intoxicated and knowing that there were no medical personnel on site, deputies placed Ms. Royston in an isolation cell, hog-tied her, and left. Shortly thereafter, deputies observed Ms. Royston banging her head against concrete. Rather than arranging for a medical assessment,

deputies entered Ms. Royston's cell and put her in a football helmet so she wouldn't strike her head again while still in the hog-tie. When a Turn Key nurse finally saw Ms. Royston, she charted that she was unable to obtain vital signs, unable to communicate with the patient, and occasionally Ms. Royston's eyes would open and roll back. Despite knowing she had banged her head on concrete and observing Ms. Royston's obviously emergent condition, the nurse did nothing to secure higher level care, leaving Ms. Royston to languish on the ground, rolling side to side in extraordinary pain, for more than four hours, at which time security staff made the decision to send Ms. Royston to the hospital. A CT scan revealed Ms. Royston had suffered intercranial hemorrhaging, and the delay in care caused permanent and irreversible damage. Turn Key settled a lawsuit arising from the incident in 2021.

269.     Twenty-five-year-old Caleb Lee died on September 24, 2017, as a result of a cardiopulmonary arrest after Turn Key medical staff at the Tulsa County Jail ignored his serious and worsening symptoms for days. When he was booked into the jail, staff noted that Mr. Lee was being treated at a methadone clinic daily and that, by then, it had been about 48 hours since his last dose. Turn Key staff knew that Mr. Lee also had cardiac disease, hypertension, and was already experiencing withdrawal. By his second day in the jail Mr. Lee was hallucinating, and over the course of the next several days his vital signs became abnormal. The onset of hallucinations and abnormal vital signs were clear signals that there was an underlying and emergent medical condition. Mr. Lee continued to deteriorate – he was not eating and was visibly shaking and delusional. Turn Key medical staff nonetheless canceled three follow up appointments and did not secure higher-level evaluation and treatment for Mr. Lee. Finally, the day before his death, detention officers moved Mr. Lee from his cell to the medical unit when he was found lying on

the floor complaining of chest pain. He began convulsing and foaming at the mouth when he arrived at the medical unit, but medical personnel did not offer any treatment while Mr. Lee was convulsing. Mr. Lee was eventually transported to the hospital, where he died. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Mr. Lee's serious medical needs was settled in February 2022.

270.   On October 17, 2016, Brenda Jean Sanders was booked into the Creek County Justice Center for outstanding warrants. While in the jail and under the care and control of the Turn Key medical personnel, Ms. Sanders' health dangerously deteriorated. Medical personnel and jail staff noted that she had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks. As her health obviously and swiftly deteriorated, medical personnel never provided Ms. Sanders any care, nor did they ever even obtain her medical history. On or about November 20, 2016, a full 35 days after entering the Creek County Justice Center, Turn Key medical personnel and jail staff finally had Ms. Sanders transported to the hospital after she had become fully incapacitated and was on the brink of death. At the hospital Ms. Sanders was diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." Ms. Sanders died the day after her admittance to the hospital. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Ms. Sanders' serious medical needs is ongoing.

271.   In January 2018, 35-year-old Marconia Lynn Kessee was arrested for misdemeanor trespassing. In the intake area of the F. Dewayne Beggs Detention Center, Mr. Kessee was stumbling, falling over, slurring his speech, sweating, short of breath, and convulsing so violently he hit his head on the wall. A Turn Key nurse did not recognize that Kessee was overdosing on

methamphetamine and prescription drugs, instead accusing him of faking symptoms that included seizures. The nurse and jailers left Mr. Kessee alone in a cell, and within two hours, he was dead of an overdose. Turn Key settled the lawsuit arising from Mr. Kessee's death for a confidential amount in 2023.

272.     Michelle Ann Caddell was booked into the Tulsa County Jail at the end of December 2018 and tested positive for chlamydia about a month later. Reasonably trained medical professionals know that chlamydia significantly increases the likelihood that a person will develop cervical cancer. Starting in June and continuing through August 2019, Ms. Cadell exhibited and repeatedly complained of myriad serious symptoms including continuous irregular vaginal discharge, hip and pelvic pain, heavy bleeding, anemia, elevated white blood cell count, heavy growth of E. Coli, and difficulty with bowel movements. In the face of these serious and worsening symptoms, Turn Key medical staff did not perform additional evaluation or diagnostics. Rather, they offered Ms. Caddell Tylenol and accused her of abusing the medical sick call system. Ms. Cadell continued to deteriorate over the next several months, to the awareness of Turn Key staff. A pap smear in early October revealed atypical squamous cells, but even then, Turn Key staff did not have Ms. Caddell immediately evaluated so she could receive treatment for what was very likely cancer. By October 30, Ms. Cadell began discharging tissue from her vagina in addition to blood. Since no OBGYN would be in the building for another 11 days, Ms. Caddell was finally sent to the hospital. A biopsy revealed Ms. Caddell had cervical cancer that had progressed to at least stage 3 and extensive necrosis. Hospital staff determined that she would need radiation and/or chemotherapy. Upon learning the severity of Ms. Caddell's diagnosis the county and Turn Key worked swiftly to release Ms. Caddell from custody so they would not incur the cost of her cancer

treatment. Ms. Caddell fought the cancer for months, but eventually succumbed on August 16, 2020. A federal lawsuit arising from her death is ongoing.

273. On October 30, 2018, Angela Yost died after six days of suffering without medical attention at the Ottawa County Jail. Medical staff at the jail were well-acquainted with Ms. Yost and were aware she had several serious medical conditions, including that she had recently been hospitalized for a poorly-healing wound, cellulitis, and DVT in her left leg. Still, she did not see a nurse and was not provided any medications for the first three days she was at the jail, even as her condition observably declined. During the first three days, Ms. Yost's pain in her left leg increased and the wound began to secrete a yellow discharge and foul odor. She struggled to move, laid on the floor, and complained that she needed to be seen by a doctor and receive her medications. When Ms. Yost was finally assessed, the Turn Key nurse did not refer Ms. Yost to a higher level of care, or even make a plan for her to be seen by a doctor or NP, despite the fact that she had numerous and serious co-morbidities, had not received any medications for three days, and obviously had an active infection. Rather, the nurse informed a Nurse Practitioner of Ms. Yost's condition, and despite the NP's awareness that Ms. Yost had an active infection and serious co-morbidities, she also did nothing. Ms. Yost continued to observably deteriorate over the next three days. On the morning of October 30, she was helped to the shower where she collapsed and was unresponsive. She was pronounced dead 17 minutes after she arrived at the emergency room. A lawsuit arising from her death was filed in 2020.

274. In November 2018, Misty Bailey, a pretrial detainee at Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not keep down any food or medications, and also began experiencing lower back pain and severe pain

when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to the hospital. For two days Ms. Bailey continued to deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to the hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care.

At the hospital Ms. Bailey was diagnosed with a bacterial UTI infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, the court emphasized that *Monell* liability is adequately alleged at the pleading stage where plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court finds that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." *Bailey v. Turn Key Health Clinics, LLC*, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021). The case appears to have settled confidentially as a stipulation of dismissal was filed on December 10, 2021.

275.     Lesley Sara Hendrix died on October 12, 2020, after repeated requests for medical attention were disregarded and denied. Ms. Hendrix developed a rash on her legs in early October, which she reported to Turn Key medical personnel, but nothing was done to address this condition. Approximately one week before her death, she asked the nurse dispensing medications to arrange

for a medical evaluation because she was not feeling well, experiencing nausea, severe pain, dizziness, and vomiting. Turn Key staff told Ms. Hendrix that they would not permit her to make an appointment orally and that she would have to use a computer kiosk. The only kiosk Ms. Hendrix had access to was broken, and no other means of scheduling an appointment were provided. By October 10, Ms. Hendrix was pale with black circles and bags under her eyes, incoherent, acting erratically, struggling to stand, and complaining that she felt like she was dying. Having seen on a video visit the dire condition her daughter was in, Ms. Hendrix's mother called the jail and told staff she required immediate medical attention, but Ms. Hendrix received none. The next day Ms. Hendrix collapsed and was finally transported to the hospital. Upon her arrival Ms. Hendrix was in critical condition, was in acute respiratory distress, metabolic acidosis and severe septic shock. During the emergency medical assessment hospital staff found Ms. Hendrix had an enormous black, bulging wound to her perineum, lower abdomen, buttocks, and genitals caused by necrotizing fasciitis. Ms. Hendrix died the following morning in the ICU at the hospital. A federal lawsuit related to her death is ongoing.

276. In August 2021, Larry Eugene Price, Jr. died of starvation and dehydration after a year in solitary confinement at the Sebastian County Jail. The 51-year-old was schizophrenic and had an IQ below 55 when he was arrested and jailed for walking into a small police station on August 19, 2020, and pointing his fingers like guns at officers while cursing and making threats. He was charged with felony terrorist threatening, and taken to Sebastian County Jail, where Turn Key was responsible for providing medical care. Mr. Price would have been released with $100 for bail, but he was destitute. Turn Key staff knew that Mr. Price was being kept in solitary confinement due to his psychosis and that he was not consistently taking his medications, but did

not regularly check on him or make any effort to get him transferred to a more appropriate facility, and never followed up after discontinuing Mr. Price's antipsychotic medication roughly nine months before his death. Because of his unaddressed mental health needs, Mr. Price barely ate or drank, as custody and Turn Key staff were aware. Instead, they ignored his life-threatening condition altogether and simply watched from the sidelines as he steadily decompensated and left him to consume his own feces. In the early morning hours of August 29, 2021, a corrections officer found Mr. Price in his isolation cell-lying in a pool of standing water and urine, unresponsive. When Mr. Price entered the jail, he was a well-nourished, 6'2" tall man who weighed 185 pounds. When EMTs transported him to the hospital, they estimated his weight to be 90 pounds. Mr. Price's family reached a $6 million settlement with Sebastian County and Turn Key Health Clinics in September 2024. The parties will pay $3 million each for what happened to Mr. Price while he was in their care.

277. On September 5, 2021, Amy Cross died of methamphetamine toxicity in the Weld County Jail. For over seven hours, Turn Key medical staff openly disregarded her obvious symptoms of a medical emergency, including: chest pain, shaking, erratic behavior, critically high heart rate, abnormal breathing, being so hot she was laying on the floor shirtless, seizing, her fingers turning blue, and foaming at the mouth. Despite knowing of these obviously emergent symptoms, despite deputies calling medical staff repeatedly with concerns about Ms. Cross's worsening condition and declaring two medical emergencies, Turn Key staff recklessly disregarded her symptoms as fake. They pre-determined not to hospitalize Ms. Cross because they believed she was "acting a fool." No ambulance was called until she was already dead. A federal lawsuit arising from her death is ongoing – a motion to dismiss was denied.

278.    In June of 2022, Eusebio Castillo Rodriguez detained in the Union County, Arkansas, jail on a DWI charge. Although Turn Key staff were aware he was experiencing severe, potentially life threatening, alcohol withdrawal, they did not treat his symptoms or send him to the hospital for more than five days. Eventually Rodriguez was found half-naked, incoherent, and trembling severely while lying face down on the floor of his solitary cell. Even then, Turn Key staff did not call 911 for Mr. Rodriguez. Rather, they had him transported to the nurses' station and then to the booking area so he could be changed out of his jail uniform and transported to the hospital in a police vehicle. Once Mr. Rodriguez was released from the jail's custody, and neither the jail nor Turn Key was financially responsible for his care, an ambulance was finally called for Mr. Rodriguez. Nearly four hours had passed since he was found unresponsive. The hospital life-flighted him to a larger hospital in Little Rock, where he died days later. Correctional Medicine Expert Dr. Thomas Fowlkes opined: The jail staff "intended for Mr. Rodriguez to be merely dumped off at the hospital with no apparent concern for his wellbeing and without taking any responsibility for the serious medical condition which developed directly as a result of their lack of medical care." A federal lawsuit concerning Mr. Rodriguez's death is ongoing.

279.    As here, Turn Key's unconstitutional customs, practices, and policies of (1) disregarding and minimizing inmates' medical complaints; (2) delaying or denying indicated testing and treatment; (3) failing to timely send patients to the hospital; (4) understaffing; (5) using nurses to practice medicine recklessly outside their scope; or (6) transferring patients without necessary continuity of care records, were a moving force causing each of these patients to suffer serious harm or death.

**Allegations Relating to Boulder County Entity Defendants' *Monell* Liability**

280. It is a common and recurring need in all jails that inmates have medical conditions that require timely transport to hospitals for higher level assessment and higher acuity care.

281. Evaluating and addressing the needs of inmates with symptoms of endocarditis and sepsis, dental abscess/infection, shortness of breath, abnormal vital signs, as well as associated medical conditions, is a usual and recurring task for health care workers in Boulder County Jail.

282. Individual Boulder Medical Defendants abandoned Mr. Borkovec while he was suffering from an obvious medical crisis for nearly a month, causing him to die of a treatable bacterial infection. They did not obtain higher level evaluation and arrogated to themselves medical decision making that was recklessly outside of the scope of practice for their licensure.

283. Even after Mr. Borkovec's oxygen saturation dropped into the 80s, Individual Boulder Medical Defendants continued to follow their deliberately indifferent policy of disregarding subjective complaints and presuming inmates are malingering, assuming symptoms have benign causes, and refusing to provide emergency treatment.

284. Because Boulder holds and treats far fewer inmates than Turn Key, which operates in numerous facilities throughout the region, less information is readily publicly available about its customs, policies, and practices. However, each of the Individual Boulder Medical Defendants violated Mr. Borkovec's constitutional right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner, evidencing a custom, policy, and practice of: (1) not obtaining or reviewing outside medical records; (2) responding to medical complaints without taking complete vital signs or performing any assessment; (3) considering and treating each symptom in isolation with over the counter medications; (4) craning to find benign causes for even serious symptoms; (5) failing to obtain diagnostic tests and labs when indicated; (6) ignoring

life-threatening symptoms; (7) failing to refer inmates for higher level evaluation and treatment, or send them to the hospital, even when necessary to prevent serious injury or death; (8) allowing and training nurses to practice outside their nursing scope; and, (9) a widespread custom and tolerated practice and habit of disregarding inmate complaints and symptoms as exaggerated, faked, benign, or caused by drug use.

285.    Boulder County Jail supervisors' express toleration of this pattern by all of the Individual Boulder Medical Defendants, evinces Boulder Entity Defendants' custom, policy, or practice of deliberate indifference in medical care.

286.    These customs are so widespread that Boulder Entity Defendants were on notice, prior to Mr. Borkovec's death, that there was a widespread pattern and practice of deliberately indifferent medical care in Boulder, which included: (1) not obtaining or reviewing outside medical records; (2) responding to medical complaints without taking complete vital signs or performing any assessment; (3) considering and treating each symptom in isolation with over the counter medications; (4) craning to find benign causes for even serious symptoms; (5) failing to obtain diagnostic tests and labs when indicated; (6) ignoring life-threatening symptoms; (7) failing to refer inmates for higher level evaluation and treatment, or send them to the hospital, even when necessary to prevent serious injury or death; (8) allowing and training nurses to practice outside their nursing scope; and, (9) a widespread custom and tolerated practice and habit of disregarding inmate complaints and symptoms as exaggerated, faked, benign, or caused by drug use.

287.    There is also a widespread pattern and practice amongst Boulder custodial staff of performing cursory welfare checks and delaying requests for medical attention.

288.    Thus, just two months prior, on September 7, 2022, Kip Zwickel died from

methamphetamine intoxication after attempting to get medical attention the entire night by knocking on his cell door.

## V. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Unconstitutional Medical Care**
(Plaintiff Estate against each Individual Defendant)

289.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

290.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

291.    Avery Borkovec was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

292.    Mr. Borkovec was a pre-trial detainee.

293.    As a pre-trial detainee, he was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment. To the extent his status was considered a convicted inmate, Mr. Borkovec was protected from deliberate indifference to his known serious medical needs by the Eighth Amendment. These rights were clearly established at the time of his incarceration and death.

294.    All Individual Defendants to this claim were either deliberately indifferent in their own care and treatment of Mr. Borkovec or were deliberatley indifferent in their gatekeeper duties

of obtaining timely and obviously needed higher level medical care.

295. Defendants Reichert, Trevizo, Moreno-Santacruz, High, and Morrow were all private actors working in a jail and employed by private entities. Therefore, none of them are entitled to qualified immunity. To the extent Defendants Parker and Davis are private employees, they are not entitled to qualified immunity.

296. Each Individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

297. As a result of the allegations contained in this Complaint, Individual Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Borkovec's constitutional rights by acting with deliberate indifference to his serious medical needs and disregarding the excessive risks associated with his life-threatening medical condition, despite being expressly aware of his known serious medical needs and obvious need for the same.

298. All of the Individual Defendants named in this Complaint personally participated in the constitutional deprivations described herein.

299. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Borkovec's death and his Estate's losses and injuries.

300. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and and other special damages, all in amounts to be proven at trial.

301. All Defendants are jointly and severally liable for the complained of injuries.

302. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-

judgment interest and costs as allowable by federal law.

303.    Plaintiff is also entitled to punitive damages against Individual Defendants to this claim.

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Deliberately Indifferent Policies
(Plaintiff Estate against all Broomfield Entity Defendants and all Boulder Entity Defendants)

304.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

305.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

306.    Mr. Borkovec was a citizen of the United States and all of the entity Defendants to this claim are persons for the purposes of 42 U.S.C. §1983.

307.    Mr. Borkovec was a pre-trial detainee.

308.    As a pre-trial detainee, he was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment. To the extent his status was considered a convicted inmate, Mr. Borkovec was protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

309.    Broomfield Entity Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which include customs and training.

310.    The City & County of Broomfield is non delegably liable for Turn Key's

unconstitutional policies and liable for its own failure to enforce and require constitutional care for its inmates.

311. Turn Key had a widespread pattern, practice, and custom of failing to properly treat inmates with serious medical needs, often disregarding them as faked, purposeful or malingering.

312. Alarming deficiencies in screening, monitoring, and the adequate delivery of medical care were identified and otherwise known and obvious to Turn Key for years prior to Mr. Borkovec's death. Despite this knowledge, Turn Key and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk, in part because of impermissible profit driven considerations affecting hospitalizations, diagnostic testing, and staffing.

313. Turn Key failed to adequately train personnel to recognize and respond to the serious medical needs of their patients. In the light of the duties assigned to health care workers, the need for more or different training and supervision of them was obvious, and the failure to do so by Turn Key was deliberately indifferent to the rights of the relevant public.

314. Defendant Turn Key ratified the unconstitutional conduct of its employees, agents, and/or subcontractors with regard to the unconstitutional conduct visited upon Mr. Borkovec, as they approved of the conduct and the basis for it.

315. Turn Key Defendants are liable for their deliberately indifferent policies, practices, habits, customs and widespread usages as described with particularity above with respect to the serious medical needs of inmates like Mr. Borkovec and their deliberately indifferent failures in training and supervising their employees, including individual Defendant Dr. Reichert. These Defendants have a widespread pattern of deliberately indifferent medical care in Broomfield and other jails where they provide medical care, which includes: (1) disregarding and minimizing

inmates' medical complaints; (2) delaying or denying indicated testing and treatment; (3) failing to timely send patients to the hospital; (4) understaffing; (5) using nurses to practice medicine recklessly outside their scope; and (6) transferring patients without necessary continuity of care records.

316.     The Broomfield Entity Defendants' deliberately indifferent policies, failures to train and/or supervise, were moving forces in the violation of Mr. Borkovec' constitutional rights.

317.     The Broomfield Entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

318.     The failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Borkovec.

319.     The Broomfield Entity Defendants, through policy makers and final delegated decision-makers, ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious medical conditions, in part to save money.

320.     As a proximate result of Broomfield Entity Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Borkovec, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, and his herein described horrific and terrifying pain and suffering during and leading up this fatal event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Mr. Borkovec under the mortality tables and other special damages,

all in amounts to be proven at trial.

321.    Boulder Entity Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which include customs and training.

322.    Boulder County is directly liable for its own deliberately indifferent policies and supervision that were moving forces in Mr. Borkovec' constitutional injury, for its deliberately indifferent training and supervision of nurses, for its own role in setting policy regarding medical care at the BCDC, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference. Boulder County has a widespread pattern of deliberately indifferent medical care and obtaining medical care by medical and custodial staff in BCDC, which includes: (1) not obtaining or reviewing outside medical records; (2) responding to medical complaints without taking complete vital signs or performing any assessment; (3) considering and treating each symptom in isolation with over the counter medications; (4) craning to find benign causes for even serious symptoms; (5) failing to obtain diagnostic tests and labs when indicated; (6) ignoring life-threatening symptoms; (7) failing to refer inmates for higher level evaluation and treatment, or send them to the hospital, even when necessary to prevent serious injury or death; (8) allowing and training nurses to practice outside their nursing scope; (9) a widespread custom and tolerated practice and habit of disregarding inmate complaints and symptoms as exaggerated, faked, benign, or caused by drug use; and (10) conducting cursory custodial checks on inmates.

323.    The BOCC and Defendant Sheriff are non delegably liable for Maxim's unconstitutional policies.

324.    The Boulder Entity Defendants' deliberately indifferent policies, failures to train and/or supervise, were moving forces in the violation of Mr. Borkovec' constitutional rights.

325. The Boulder Entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

326. The failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Borkovec.

327. The Boulder Entity Defendants, through policy makers and final delegated decision-makers, ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious medical conditions, in part to save money.

328. As a proximate result of Boulder Entity Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Borkovec, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, and his herein described horrific and terrifying pain and suffering during and leading up this fatal event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Mr. Borkovec under the mortality tables and other special damages, all in amounts to be proven at trial.

329. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

330. All Defendants are jointly and severally liable for the complained of injuries.

331. Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

332.     Plaintiffs are entitled to punitive damages against Turn Key Defendants and Maxim.

## V.     PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court award against Defendants:

(a)     All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non-economic and economic damages available under the law;

(b)     Punitive damages on all claims as allowed by law and in an amount to be determined at trial against all Defendants;

(c)     Attorneys' fees and costs;

(d)     Pre- and post-judgment interest as appropriate; and

(e)     Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFF RESPECTFULLY REQUESTS TRIAL BY JURY.**

Respectfully submitted this 27th day of September, 2024.

*/s/ Rachel Kennedy*
Rachel Kennedy
Anna Holland Edwards
Erica T. Grossman
John Holland
Dan Weiss
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
rachel@hheglaw.com
Phone:  (303) 860-1331
Fax:  (303) 832-6506
*Attorneys for Plaintiff*