IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-02679-PAB-SBP

THE ESTATE OF AVERY JAMES BORKOVEC,
by and through its co-personal representatives Dylan Bolt and Chris Borkovec,

      Plaintiff,

v.

TURN KEY HEALTH CLINICS, LLC,
CITY AND COUNTY OF BROOMFIELD,
SHERIFF CURTIS JOHNSON, in his official capacity,
BRYAN REICHERT, individually,
CHANTEL TREVIZO, individually,
NELY MORENO-SANTACRUZ, individually,
DEYANIRA MARTINEZ, individually,
SHONDA HIGH, individually,
KAELA SEEBURGER, individually,
ALEXIS HENDERSON, individually,
TIFFANY JONES, individually,
MEL PARKER, individually,
JACK MARKLING, individually,
JENNIFER SAMUELS, individually, and
BLAKE MORROW, individually,

      Defendants.

---

# ORDER

---

This matter is before the Court on defendants the City and County of

Broomfield's Motion to Dismiss [Docket No. 46], Shonda High's Motion to Dismiss

[Docket No. 48], Blake Morrow's Motion to Dismiss [Docket No. 49], Sheriff Curtis

Johnson's Motion to Dismiss [Docket No. 51], Alexis Henderson, Tiffany Jones, Jack

Markling, Deyanira Martinez, and Kaela Seeburger's Motion to Dismiss [Docket No. 52],

and Jennifer Samuels's Motion to Dismiss [Docket No. 64].  Plaintiff the Estate of Avery

James Borkovec, by and through its co-personal representatives Dylan Bolt and Chris

Borkovec, filed responses to the motions.  Docket Nos. 71, 72, 80, 81, 82, 91.

Defendants filed replies in support of their motions.  Docket Nos. 78, 79, 97, 98, 102,

105.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.    FACTS[1]

On September 26, 2022, Avery James Borkovec arrived at the Emergency

Department at Good Samaritan Hospital for abdominal pain and persistent vomiting.

Docket No. 1 at 12, ¶ 69.  He was given intravenous fluids and anti-nausea medication.

*Id.*, ¶ 70.  Doctors at Good Samaritan Hospital[2] ordered a Complete Blood Count

("CBC") and blood culture for Mr. Borkovec.  *Id.*, ¶ 71.  The CBC showed that Mr.

Borkovec had an "extremely elevated white blood cell count" ("WBC") of 17.77 K/uL,

which indicated that he was fighting an infection that was likely bacterial in nature.  *Id.*,

¶ 72.

However, Mr. Borkovec was discharged from the hospital before the results of

the blood culture came back.  *Id.* at 13, ¶ 73.  Those results showed that Mr. Borkovec

had staph bacteremia, which is an infection of the bloodstream.  *Id.*  Staph bacteremia

is a "serious infection that has a high risk of complications and death if left untreated."

*Id.*, ¶ 74.  Once staph bacteria are in the bloodstream, the infection "can spread to vital

---

[1] The facts below are taken from plaintiff's complaint, Docket No. 1, and are
presumed to be true, unless otherwise noted, for purpose of ruling on the motions to
dismiss.

[2] The Court presumes that plaintiff refers to Good Samaritan Hospital located in
Lafayette, Colorado.  *See* "Good Samaritan Hospital,"
https://intermountainhealthcare.org/locations/intermountain-health-good-samaritan-
hospital (last visited Aug. 29, 2025).

organs and tissues such as the heart, lungs, and brain." *Id.* Therefore, patients with staph bacterium must immediately begin taking antibiotics. *Id.*, ¶ 75.

Nurses cannot "diagnose or determine the cause of abnormal vital signs or symptoms or disregard them as unimportant." *Id.* at 12, ¶ 67. While Registered Nurses ("RN") can "form nursing diagnoses," they "must convey any abnormal findings to a provider licensed to form medical diagnoses." *Id.* Under the supervision of a Registered Nurse, a Licensed Practical Nurse ("LPN") can "collect information about a patient," but cannot form "nursing diagnoses." *Id.*

On September 29, 2022, Mr. Borkovec was arrested at a Walgreens store in Broomfield, Colorado and was transported to the Broomfield Detention Center. *Id.* at 13, ¶ 76. Mr. Borkovec was a pre-trial detainee at the Broomfield Detention Center for eight days. *Id.* The City and County of Broomfield contracted with Turn Key Health Clinics, LLC ("Turn Key') to provide medical care and services to detainees and inmates at the Broomfield Detention Center. *Id.* at 37, ¶ 248. Shortly after Mr. Borkovec's arrival at the Broomfield Detention Center, defendant Turn Key LPN Chantel Trevizo received a "detailed summary" of the "encounter and treatment" Mr. Borkovec received at Good Samaritan Hospital on September 26, 2022. *Id.* at 13, ¶ 77.

Ms. Trevizo added the summary to Mr. Borkovec's Broomfield Detention Center medical chart. *Id.* The summary showed that Mr. Borkovec went to the Emergency Department at Good Samaritan Hospital for abdominal pain and persistent vomiting that occurred during the early morning of September 26, 2022. *Id.*, ¶ 78. The summary showed that Mr. Borkovec had been given IV fluids and medications prior to his discharge. *Id.* Mr. Borkovec's elevated WBC findings, blood culture results, and a

3

recommendation that Mr. Borkovec receive "IV antibiotic therapy" were included in the summary. *Id.*, ¶ 79. The summary indicated that, as of September 26, 2022, Mr. Borkovec's pulse, respiratory rate, and oxygen saturation were normal. *Id.* But Mr. Borkovec had elevated pulse rates throughout his incarceration at Broomfield Detention Center. *Id.* at 14, ¶ 84.

On October 3, 2022, Turn Key employee Dr. Bryan Reichert performed a "chronic care exam" on Mr. Borkovec and acknowledged that Mr. Borkovec's recent labs showed a WBC of 17.77 K/uL and that his two blood cultures were positive for staph bacteremia. *Id.* at 15, ¶ 91. Despite the fact that doctors at Good Samaritan Hospital charted that staph aureus "is unlikely to be a contaminant in 2 bottles" and despite Mr. Borkovec's WBC indicating that he had a significant infection, *id.*, ¶ 93, Dr. Reichert concluded that the blood cultures were contaminated and that Mr. Borkovec was not experiencing "true bacteremia." *Id.* Dr. Reichert ordered a "routine repeat CBC" for Mr. Borkovec and charted that medical staff should "consider repeat blood cultures if WBC remains elevated." *Id.* at 15-16, ¶ 95. He also charted that medical staff should "monitor for any signs of infection/sepsis for which he will need to be sent to the ER given recent positive blood cultures." *Id.* at 16, ¶ 97.

Mr. Borkovec's appointment for the repeat CBC was scheduled for October 6, 2022. *Id.* at 17, ¶ 106. However, the repeat CBC never occurred because Ms. Trevizo "rescheduled" the appointment. *Id.* On October 7, 2022 at approximately 10:30 am, Mr. Borkovec was transferred to Boulder County Jail due to overpopulation at the Broomfield Detention Center. *Id.*, ¶ 107. Two hours after Mr. Borkovec was transferred,

Ms. Trevizo charted that the CBC had been completed, even though it had not.  *Id.*,
¶ 110.

During his medical intake screening at Boulder County Jail, Mr. Borkovec told
Boulder County Jail employee RN Alexis Henderson that he previously used heroin
intravenously four times daily and that his last use occurred two weeks ago.  *Id.* at 18,
7-8, ¶¶ 35, 111.  He reported that he did not have any ulcers, breathing problems, or
dental problems.  *Id.* at 18, ¶ 112.  Mr. Borkovec informed Ms. Henderson that for the
last eight days he had been incarcerated at the Broomfield Detention Center,
experienced chronic pain in his back, knee, and neck, and that he recently visited Good
Samaritan Hospital for gastroparesis and cyclic vomiting.  *Id.*, ¶ 113.  Aching joints and
muscles, shortness of breath, chest pain, difficulty breathing, fatigue, pallor, fever, chills,
and/or sweating are symptoms of a serious health condition, particularly in an IV drug
user, that must be evaluated in a timely manner.  *Id.* at 11, ¶ 58.  Common infections
affecting IV drug users are skin infections, blood infections, and heart infections, also
known as endocarditis.  *Id.*, ¶ 59.

Health care workers at Boulder County Jail, however, did not "take any steps to
obtain care summaries or other continuity of care documents" from the Broomfield
Detention Center or Good Samaritan Hospital.  *Id.* at 18, ¶ 114.  They did not ask Mr.
Borkovec to sign a "Release of Information."  *Id.*  Ms. Henderson told Mr. Borkovec to
submit a written request for medical care, also known as a "kite," if he needed care.  *Id.*,
¶ 115.

On October 8, 2022, Mr. Borkovec submitted a kite, requesting Tylenol for back
pain and digestion issues.  *Id.*, ¶ 116.  In response, Ms. Henderson authorized Mr.

Borkovec to take Naproxen twice daily for chronic pain.  *Id.*, ¶ 117.  On October 11,

2022, Mr. Borkovec submitted another kite requesting medication for indigestion.  *Id.* at

18-19, ¶ 118.  Boulder County Jail employee RN Tiffany Jones started Mr. Borkovec on

Tums/Maalox three times daily as needed.  *Id.*  at 8, 18-19, ¶¶ 36, 118

On October 12, 2022, Mr. Borkovec submitted a kite, requesting a muscle relaxer

because Tylenol and nonsteroidal anti-inflammatory drugs ("NSAIDs") were not relieving

the pain in his back and body.  *Id.* at 19, ¶ 119.  In response to the kite, defendant

Boulder County Jail RN Deyanira Martinez spoke to Mr. Borkovec about the

"generalized pain" he complained of while she was at his housing unit distributing

medications, known as a "med pass."  *Id.* at 8, 19, ¶¶ 37, 120.  Without consulting

another medical provider or performing a "nursing assessment," Ms. Martinez

concluded that Mr. Borkovec was "faking or exaggerating his pain."  *Id.* at 19, ¶ 121.

Ms. Martinez charted that Mr. Borkovec was seen walking down the stairs without

difficulty, with a steady gait and erect posture.  *Id.*

On October 15, 2022, Mr. Borkovec submitted a kite, complaining of insomnia

and body pain that was so severe it could not be controlled through the twice daily use

of NSAIDs.  *Id.* at 19-20, ¶ 124.  The next day, Mr. Borkovec submitted at least five

kites.  *Id.* at 20, ¶ 125.  In these kites, he complained of vomiting, "extreme tooth ache

causing pain and migraine, tightness in back and insomnia causing lack of sleep.

Depression and anxiety getting worse."  *Id.*  Dental Assistant Mel Parker, an "agent,

employee, and/or subcontractor of the Boulder County Jail," responded to the kite,

stating "please kite separately for medical and mental health concerns."  *Id.* at 8, 20-21,

¶¶ 38, 131.  Defendant Boulder County Jail Nurse Kaela Seeburger also responded to

the kites, concluding that Mr. Borkovec's vomiting, insomnia, and body pain did not

need to be addressed.  *Id.*19-20, ¶ 131.  She wrote in response, "Not approved for a

diet change.  Kite mental health for melatonin.  Not approved for Tramadol."  *Id.*

Toothaches are frequently caused by abscess, a build-up of pus, or other oral

infections.  *Id.* at 20, ¶ 126.  Untreated tooth abscess can lead to endocarditis and

sepsis.  *Id.*, ¶ 127.  The onset of "extreme" dental pain, severe back tightness and pain,

severe diffuse body pain, vomiting, and anxiety are symptoms that indicate an "illness

has a systemic component likely caused by bacteria."  *Id.*, ¶ 128.  Furthermore, these

are well-understood symptoms of endocarditis and sepsis.  *Id.*, ¶ 129.

On October 17, 2022, Mr. Borkovec submitted a kite to the mental health unit as

directed, complaining that he had not slept in three to four days and required melatonin.

*Id.* at 22, ¶ 135.  He submitted another kite stating that he had "extreme tooth ache,

causes migraines."  *Id.*, ¶ 136.  In response to the kite, defendant Boulder County Jail

RN Jack Markling stated that Mr. Borkovec could take Tylenol twice a day, in addition to

the Naproxen that he was taking.  *Id.* at 8, 22, ¶¶ 40, 139.  Mr. Markling did not do

anything else in response to the kite.  *Id.* at 22, ¶¶ 137-39.  Mr. Markling was authorized

by Boulder County Jail policy to "start treating dental pain and infection without a

dentist's involvement or send a patient with a serious dental infection to the emergency

room."  *Id.*, ¶ 138.  Ms. Parker also responded to this kite, stating that Mr. Borkovec had

been "referred to dental."  *Id.*, ¶ 141.  There is no record of Mr. Borkovec being seen by

a dentist before his death, which occurred three weeks later.  *Id.* at 22-23, ¶ 142.

On October 18, 2022, Mr. Borkovec submitted two kites, in which he described

his depression and anxiety as getting significantly worse and wrote "I've lost a lot of

weight from not being able to eat the normal meals.  Could I get Ensure or an

[alternative] to help supplement my diet.  A lot of the food makes my gastroparesis

worse.  Will sign ROI for medical paperwork for proof."  *Id.* at 23, ¶ 143.  In response,

Ms. Jones arranged for Mr. Borkovec to receive weekly weight check-ins for a month.

*Id.*, ¶ 144.  She did not follow-up on Mr. Borkovec's offer to sign a Release of

Information, which would have provided Mr. Borkovec's medical history showing a

"constellation of symptoms . . . caused by progressing staph bacteremia that could be

treated with antibiotics."  *Id.*, ¶ 146.

On October 21, 2022, Mr. Borkovec submitted a kite, complaining that he "came

down with [a] cold before transfer to inmate worker, makes me fatigued and sore."  *Id.*,

¶ 147.  Defendant health care worker Blake Morrow,[3] in response to the kite, authorized

Mr. Borkovec to have Mucinex twice daily for five days.  *Id.* at 24, ¶ 150.  He noted that

Mr. Borkovec was already on Tylenol and an antihistamine.  *Id.*[4]

---

[3] Plaintiff does not identify Mr. Morrow's title.  *See* Docket No. 1 at 8, ¶ 41.
However, plaintiff does allege that Mr. Morrow worked for Maxim Healthcare Staffing
Services, Inc.("Maxim") and worked at Boulder County Jail.  *See id.*

[4] Plaintiff alleges that all of the "responding nurses" to Mr. Borkovec's kites
reviewed his "earlier kites and complaints" such that they would understand the "critical
cumulative picture" of Mr. Borkovec's declining health.  Docket No. 1 at 24, ¶ 154.  The
Court disregards this allegation because it is a "naked assertion[] devoid of further
factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations,
alteration, and citation omitted).  The complaint does not plead facts that make it
plausible each nurse responding to a kite would review Mr. Borkovec's prior kites.  *See
Vega v. Davis,* 572 F. App'x 611, 618 (10th Cir. 2014) (unpublished) (holding that the
"mere presence of records, by themselves, does not create the reasonable inference
that [defendant] read them" and "plaintiff fails to explain why it is reasonable to infer that
a warden would review all of the records of each inmate, or each inmate in the Control
Unit, or [plaintiff's] records in particular" in reversing the district court's denial of
defendant's motion to dismiss plaintiff's deliberate indifference claim); *Est. of Jimenez
by & through Mathis v. Wexford Health Sources, Inc.,* 2024 WL 5119895, at *8 (D.N.M.
Dec. 16, 2024) ("Plaintiff's allegations about Defendants' job duties do not make it

By October 24, 2022, Mr. Borkovec was too sick and weak to work.  *Id.* at 25,

¶ 157.  Because Boulder County Jail staff determined that Mr. Borkovec's "serious

health problems prevented him from working," they transferred him from the "inmate

worker" pod to the Medium-B Module, which is a more restrictive housing unit.  *Id.*  Mr.

Borkovec was to be housed there indefinitely due to his illness.  *Id.*, ¶ 158.  Upon arrival

at the Medium-B Module, Mr. Borkovec was noticeably skinny, lethargic, unable to eat,

and had pale and jaundiced skin.  *Id.*, ¶ 161.  He was regularly coughing up and

vomiting blood.  *Id.*  Every day, nurses performing med passes would see Mr. Borkovec,

often several times a day.  *Id.*, ¶ 162.  Mr. Borkovec routinely asked the nurses to send

him to the hospital and informed them that he was spitting up blood.  *Id.*  He also

routinely asked deputies in the Medium-B Module for medical attention.  *Id.*, ¶ 163.

Inmates regularly told deputies and medical staff that there was something "seriously

medically wrong with Mr. Borkovec" and that "he needed to go to the hospital."  *Id.* at

26, ¶ 165.

On October 25, 2022, Mr. Borkovec submitted a kite that complained of

persistent vomiting and wrote "normal food is making me sick and puke.  Any help is

appreciated."  *Id.*, ¶ 169.  In response, defendant Maxim Healthcare Staffing Services

("Maxim") "agent, employee, and/or subcontractor" LPN Shonda High wrote "Request

denied – not medically necessary."  *Id.* at 8-9, 26, ¶¶ 42, 170.  On October 27, 2022, Mr.

Borkovec called his great grandmother, telling her that he was transferred out of the

---

plausible that any Defendant would be aware of Mr. Jimenez's symptoms or
complaints").

inmate worker pod because he was too sick to work.  *Id.* at 27, ¶ 171.  He told her that there was fluid in his lungs.  *Id.*  Mr. Borkovec was fatigued and needed to lay down after about eight minutes of being on the phone.  *Id.*, ¶ 172.

That same day, Mr. Borkovec submitted a kite, complaining that he was "still sick" and had a persistent cough that was keeping him up at night.  *Id.*, ¶ 173.  In response, defendant Boulder County Jail Nurse Practitioner Jennifer Samuels took his "vital signs or directed them to be taken."  *Id.* at 9, 27, ¶¶ 43, 174.  Mr. Borkovec's oxygen saturation was "abnormally low" at 93% and his pulse was "extremely elevated" at 137 bpm.  *Id.*, ¶ 175.  Despite the abnormal vitals, Ms. Samuels charted that Mr. Borkovec was not experiencing any acute disease.  *Id.*, ¶ 178.  Ms. Samuels's only order was for Mr. Borkovec to receive a decongestant, Tylenol, and cough syrup for five more days.  *Id.*, ¶ 179.

Over the next four days, Mr. Borkovec became visibly more lethargic and weak and hardly left his bed.  *Id.* at 28, ¶ 183.  Inmates observed that Mr. Borkovec was in pain and struggled to walk, particularly on the stairs, and moved slowly and hunched over.  *Id.*, ¶ 184.  Mr. Borkovec tried to drink water, but could not eat and lost weight.  *Id.*, ¶ 185.  Mr. Borkovec was feverish, sweaty, coughing, frail, and struggled to talk because it hurt to breathe.  *Id*, ¶ 186.  Mr. Borkovec would vomit and spit up thick and chunky blood into two milk cartons that he kept near his bed.  *Id.*, ¶ 188.  When he breathed, Mr. Borkovec made audible gurgling sounds, indicating that there was fluid in his lungs.  *Id.* at 28-29, ¶ 189.  Mr. Borkovec walked to med pass three times a day and asked nurses to send him to the hospital.  *Id.* at 29, ¶ 190.  By November 1, 2022, Mr. Borkovec developed dark black circles under his eyes.  *Id.*, ¶ 191.  On November 2,

2022, Mr. Borkovec begged deputies for medical care. *Id.*, ¶ 196. At 11:30 pm, Mr.

Borkovec was in the "throes of a medical emergency." *Id.*, ¶ 197. Inmates who passed

by Mr. Borkovec's cell witnessed this and called deputies for help. *Id.* Mr. Borkovec

told the deputies that he was experiencing shortness of breath. *Id.*, ¶ 198. The

deputies called for the medical unit. *Id.*

At 11:36 pm, Ms. High entered Mr. Borkovec's cell. *Id.* at 30, ¶ 199. Less than

four minutes later, Ms. High determined that she needed a "second opinion on her

nursing assessment" and summoned Ms. Martinez. *Id.* At 11:41 pm, Ms. High left Mr.

Borkovec's cell and did not return. *Id.*, ¶ 200. At 11:49 pm, Ms. Martinez entered Mr.

Borkovec's cell. *Id.*, ¶ 201. Mr. Borkovec was pale and reported that he was short of

breath and had a history of asthma. *Id.* His oxygen saturation level was 88%. *Id.*,

¶ 202. If a person has an oxygen saturation of 88% and the cause is unknown, he

should be "immediately transported to an emergency room for higher level assessment."

*Id.*, ¶ 204. Ms. Martinez asked Mr. Borkovec if he had engaged in vigorous activity and

directed him to take slow, deep breaths. *Id.*, ¶ 206. Mr. Borkovec followed Ms.

Martinez's instructions, and his oxygen saturation rose to 92%. *Id.* at 30-31, ¶ 207. An

oxygen saturation level of 92% is an "abnormally low vital sign that requires immediate

provider evaluation." *Id.* Ms. Martinez determined that asthma was causing Mr.

Borkovec's symptoms, provided him a rescue inhaler, and then left. *Id.* at 31, ¶¶ 208-

09. Ms. Martinez spent less than three minutes with Mr. Borkovec. *Id.*, ¶ 211. Ms.

Martinez placed a referral for Boulder County Jail "agent, employee, and/or

subcontractor" Dr. Charles Robert Davis and requested that Mr. Borkovec be provided a

rescue inhaler and that his oxygen saturation be checked for the next three days.  *Id.* at 9, 31, ¶¶ 44, 212.  Dr. Davis accepted Ms. Martinez's diagnosis.  *Id.* at 31, ¶ 213.

Mr. Borkovec was then moved to a different cell.  *Id.* at 32, ¶ 216.  On November 3, 2022 at 9:02 am, Sergeant Dave Nagel looked in Mr. Borkovec's cell for one second to check on Mr. Borkovec before moving on to the next cell.  *Id.*, ¶ 218.  One minute later, Mr. Borkovec stumbled out of his cell, "weak, coughing, and keeled over at the waist."  *Id.*, ¶ 219.  An inmate who happened to be passing by stopped to ask if Mr. Borkovec was "okay."  *Id.* at 33, ¶ 220.  Within 30 seconds, Mr. Borkovec collapsed.  *Id.*, ¶ 221.  The inmate summoned deputies for help and waited by his side until the deputies arrived.  *Id.*

When Deputy Gerardo Wence and Sergeant Nagel arrived at Mr. Borkovec's cell, he was "ghost white," unable to sit up, was barely able to speak, was moaning in pain, and audibly struggling to breathe.  *Id.* at 33-34, ¶¶ 222-23.  Deputy Wence called for a "code 4" nonemergency medical response.  *Id.* at 34, ¶ 225.  Mr. Borkovec's lips and mouth were covered in "black coffee grounds emesis."  *Id.*, ¶ 226.  Within minutes, Mr. Borkovec was unable to speak and attempted to respond to questions with "grunts and moans."  *Id.*, ¶ 226.  When additional security staff arrived, they got a crash cart and radioed medical to "step it up please, and bring Narcan."  *Id.*, ¶ 227.

When Ms. Henderson arrived, she stated "something around the words of 'his pupils are so big.  I don't know if this is an overdose.'"  *Id.* at 35, ¶ 232.  Medical and security staff treated Mr. Borkovec for a suspected overdose and administered Narcan.  *Id.*, ¶ 234.  After Ms. Henderson administered the first dose of Narcan, Mr. Borkovec was awake and breathing, his skin was cold to touch, and he looked around and tried to

answer questions. *Id.*, ¶ 235. Mr. Borkovec's breathing rapidly dropped to 12 breaths per minute and his oxygen saturation was 70%. *Id.*, ¶ 236. Shortly thereafter, Mr. Borkovec lost consciousness and profusely vomited dark red and black blood, which contained golf-ball-sized blood clots. *Id.* Medical and security staff moved Mr. Borkovec out of his cell and began administering CPR. *Id.*, ¶ 237. Dark red blood was coming out of Mr. Borkovec's nose, mouth, and eyes. *Id.* The first responders who arrived at the scene were unable to get a pulse back. *Id.*

Boulder County Coroner and Forensic Pathologist Meredith Frank performed Mr. Borkovec's autopsy on November 4, 2022. *Id.*, at 36, ¶ 243. Before she started the autopsy, she advised the deputies in attendance to wear masks because Mr. Borkovec "appeared to be very sick." *Id.* Dr. Frank found that Mr. Borkovec's blood and lungs contained staph bacteria. *Id.*, ¶ 244. Mr. Borkovec's heart was "covered in lesions from the infectious vegetative endocarditis that was allowed to progress for weeks without treatment." *Id.* Mr. Borkovec's lungs were filled with bloody fluid, resulting in his lungs weighing more than double the weight of normal post-mortem lungs. *Id.* at 37, ¶ 245. He had ulcers throughout his gastrointestinal system and had an acute upper gastrointestinal hemorrhage. *Id.*, ¶ 246.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief *Iqbal*, 556 U.S. at 679 (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B. **Qualified Immunity**

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'"  *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III. ANALYSIS

Plaintiff brings claims against the following defendants: Turn Key; Turn Key medical staff Bryan Reichert, Chantel Trevizo, and Nely Moreno-Santacruz, in their individual capacities; the City and County of Broomfield ("Broomfield"); Boulder County Sheriff Curtis Johnson, in his official capacity; Boulder County Jail medical staff Alexis Henderson, Tiffany Jones, Jack Markling, Deyanira Martinez, Kaela Seeburger, Mel Parker, and Jennifer Samuels; and Maxim medical staff Black Morrow and Shonda High in their individual capacities.[5]  *See* Docket No. 1 at 1.

Plaintiff brings claims against defendants sued in their individual capacities for unconstitutional medical care in violation of the Fourteenth and Eight Amendment pursuant to 42 U.S.C. § 1983 (Claim One); and Broomfield and Sheriff Johnson for deliberately indifferent policies in violation of the Fourteenth and Eight Amendment pursuant to § 1983 (Claim Two).[6]  *Id*. at 56-62.  The Court first determines whether plaintiff plausibly alleges a claim against each individual defendant and then determines whether plaintiff plausibly alleges a *Monell* claim against Sheriff Johnson and Broomfield.

---

[5] Turn Key, Turn Key medical staff, and Ms. Parker did not file motions to dismiss.

[6] The parties stipulated to the dismissal of defendants Enea Hempelmann, Maxim, the Board of County Commissioners of Boulder County, Colorado, and Charles Robert Davis.  *See* Docket Nos. 73, 85, 92, 96.

Additionally, Ms. Henderson, Ms. Jones, Ms. Seeburger, Mr. Markling, Ms. Martinez, and Ms. Samuels invoke qualified immunity.  *See* Docket No. 52 at 4; Docket No. 64 at 5-6,10.  Therefore, for these defendants, the Court will determine whether they violated clearly established law.  *See Patton*, 868 F.3d at 1220.

### A.  Claim One – Unconstitutional Medical Care

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  Where the inmate is a pretrial detainee, the "deliberate indifference standard" applies through the Fourteenth Amendment.  *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023).  There is a two-part inquiry for assessing whether a prison official has shown deliberate indifference to a pretrial detainee's serious medical need.  *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020).

The first prong of the test is an objective inquiry considering whether "the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment."  *Id.* (citations omitted).  "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* (internal quotations omitted) (quoting *Sealock*, 218 F.2d at 1209).

Under the subjective inquiry, the plaintiff must establish that the prison official "knows of and disregards an excessive risk to inmate health or safety."  *Lucas,* 58 F.4th at 1137 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))).  "[T]he official must

*both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*." *Quintana*, 973 F.3d at 1029 (citation omitted). "The factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or from the very fact that the risk was obvious." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal quotation and citation omitted). Circumstantial evidence can exist where plaintiff alleges "(1) recognition of inability to treat and still declining or unnecessarily delaying referral; (2) condition is so obvious a layman would recognize it; or (3) complete denial of care in the face of a medical emergency." *Lucas,* 58 F.4th at 1139. Therefore, "the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference." *Martinez,* 563 F.3d at 1089. "The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Id*. (quoting *Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005)).

A prison official "disregards risk when he fails to take reasonable measures to abate the risk." *Lucas,* 58 F.4th at 1137. The plaintiff can satisfy the subjective inquiry by showing that the prison official either (1) failed to properly treat a serious medical condition, or that she (2) prevented the plaintiff "from receiving treatment or denie[d] access to someone capable of evaluating the inmate's need for treatment." *Id*. The first theory is known as the "failure to properly treat theory," and the second theory is known as the "gatekeeper theory." *Id*. Under the failure to properly treat theory, the question is "whether there was a functional denial of care at the time the need for treatment obviously arose." *Id.* The gatekeeper theory applies where the prison official "knows that his or her role in a medical emergency is solely to refer the patient to another." *Id.*

18

Under the gatekeeper theory, a prison official "may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.'"  *Mata*, 427 F.3d at 751 at (quoting *Sealock*, 218 F.3d at 1211).  "Even a brief delay in treatment can be unconstitutional."  *Lucas*, 58 F.4th at 1137.

### 1. Constitutional Violation

The Court first addresses whether plaintiff plausibly alleges that each Boulder County Jail defendant violated Mr. Borkovec's constitutional rights.  Starting with the objective inquiry, Ms. Henderson, Ms. Jones, Mr. Markling, Ms. Martinez, Ms. Seeburger, and Ms. Samuels do not contest that Mr. Borkovec's medical condition is sufficiently serious.  *See* Docket No. 52 at 8 n.2 ("For the purposes of this motion, the Jail Nurses assume the Complaint adequately alleges the objective component of deliberate indifference, a serious medical condition."); Docket No. 64 at 7 ("Defendant concedes that Mr. Borkovec's bacteremia and endocarditis were sufficiently serious conditions, though certainly unknown as such at the time of NP Samuels' care.").  Mr. Morrow does not address the objective inquiry.  *See* Docket No. 49.  Ms. High argues that the complaint "does not satisfy either the objective or subjective elements necessary to establish a deliberate indifference action for Nurse High's October 25, 2022, interaction."  Docket No. 48 at 9.

The Court finds that Mr. Borkovec's medical condition and resulting death is sufficiently serious to be cognizable under the objective inquiry.  *Est. of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) ("Obviously death constitutes a serious harm" that is "sufficiently serious to meet the objective prong of the deliberate indifference test.").  To the extent that Ms. High argues that the objective inquiry is not

satisfied because Mr. Borkovec's symptoms were not sufficiently serious at the time that Ms. High interacted with him, the Court rejects that argument. "[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee has contact with the prisoner.'" *Martinez*, 563 F.3d at 1088 (quoting *Mata*, 427 F.3d at 753). Accordingly, the Court will determine whether plaintiff plausibly alleges that the subjective inquiry is satisfied as to each defendant.

### a. Ms. Henderson

Ms. Henderson performed Mr. Borkovec's intake screening upon his arrival at Boulder County Jail. Docket No. 1 at 18, ¶ 111. At the intake screening, Mr. Borkovec told Ms. Henderson that he previously used heroin intravenously four times daily and that his last use was two weeks ago. *Id.* He told her that he had been at Broomfield Detention Center for the last eight days and had recently visited Good Samaritan Hospital for gastroparesis and cyclic vomiting. *Id.*, ¶ 113. Mr. Borkovec told Ms. Henderson that he experienced chronic pain in his back, knee, and neck. *Id.* Ms. Henderson received Mr. Borkovec's October 8, 2022 kite that requested Tylenol for back pain and digestion issues. *Id.*, ¶ 116. She authorized Mr. Borkovec to take Naproxen twice daily to treat the chronic pain. *Id.*, ¶ 117. Ms. Henderson saw Mr. Borkovec the day of his death on November 3, 2022 and assisted in administrating four doses of Narcan. *Id.* at 35, ¶¶ 232, 234.[7]

---

[7] Plaintiff "does not take issue with Henderson providing Narcan the day of [Mr. Borkovec's] death, although it does support his Monell theory that nurses routinely accuse inmates of misrepresenting their illness." Docket No. 80 at 6 n.4.

Ms. Henderson argues that she was not deliberately indifferent to Mr. Borkovec's serious medical needs when she received his October 8, 2022 kite requesting Tylenol for back pain and digestion issues because she approved Mr. Borkovec to take a "pain reliever equivalent to that which he requested." Docket No. 52 at 8-9. Furthermore, Ms. Henderson argues that she did not violate her gatekeeper duty because Mr. Borkovec's kite did not "put her on notice of a substantial risk of serious harm." *Id.* at 9. Regarding Ms. Henderson's conduct the day of Mr. Borkovec's death, she argues that her "misdiagnosis" of an overdose does not constitute deliberate indifference. *Id.*

Plaintiff argues that Mr. Borkovec told Ms. Henderson that he was experiencing serious symptoms, had recently visited the Emergency Room, was an IV drug user, and had recently been transferred from the Broomfield Detention Center. Docket No. 80 at 5-6. Rather than "call a doctor or obtain readily available records," plaintiff contends that Ms. Henderson "simply [gave] over the counter meds." *Id.*

The Court finds that plaintiff has not plausibly alleged that Ms. Henderson knew that there was a substantial risk of harm to Mr. Borkovec. At the intake screening, Ms. Henderson learned that Mr. Borkovec was an IV drug user, had chronic back, knee, and neck pain, and had recently been to the Emergency Room for gastroparesis and cyclic vomiting. *See* Docket No. 1 at 18, ¶¶ 111, 113-114. However, there are no allegations that Ms. Henderson observed symptoms at the intake screening that were indicative of an infection or other serious medical condition. Mr. Borkovec's October 8, 2022 kite to Ms. Henderson, complaining of indigestion and back pain, did not impute to her knowledge of a substantial risk of harm because there are no allegations that show

21

these symptoms alerted Mr. Henderson to a serious medical condition.  *See* Docket
No. 52 at 9.

Plaintiff alleges that "aching joints and muscles," along with other symptoms,
"may be related to a serious medical condition, particularly in an IV drug user," and that
all "reasonable health care workers are aware" of this.  Docket No. 1 at 11, ¶ 58.
However, plaintiff does not allege that suffering from gastroparesis or previously being
treated for cyclic vomiting are potentially indicative of a serious medical condition in an
IV user.  *See id.*  The fact that Mr. Borkovec's chronic pain *may* have been related to a
serious medical condition does not show that Ms. Henderson knew that there was a
substantial risk to Mr. Borkovec.  *See Martinez,* 563 F.3d at 1089 (the question under
the subjective inquiry is whether the symptoms were "such that a prison employee knew
the risk to the prisoner and chose (recklessly) to disregard it") (citation omitted).  Plaintiff
does not otherwise allege Ms. Henderson inferred that Mr. Borkovec's medical history
and chronic pains were indicative of a serious medical condition.  *See Est. of Newman
v. Bd. of Cnty. Commissioners of Cnty. of Montezuma,* No. 22-cv-01763-PAB-KAS,
2025 WL 948379, at *5 (D. Colo. Mar. 28, 2025) (granting summary judgment for
defendant where plaintiff's "symptoms, as seen or known by [defendant], would not
suggest an 'obvious' risk to a reasonable person sufficient to satisfy the subjective
prong of the deliberate indifference analysis" and where there was not "any evidence
that [defendant] otherwise drew an inference that [plaintiff] faced a substantial risk of
serious harm"); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 447-48 (6th Cir. 2014)
(holding that plaintiff did not satisfy the subjective inquiry because, "[a]lthough the
symptoms [plaintiff] was exhibiting could well have indicated a serious medical

condition, [defendant] interpreted the symptoms as indicative of a relatively minor condition"). Notably, Mr. Borkovec was not displaying any of the other symptoms plaintiff alleges are signs of a serious medical condition in an IV drug user. *See* Docket No. 1 at 11, ¶ 58.

Therefore, plaintiff does not plausibly allege that Ms. Henderson "refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist." See *Mata*, 427 F.3d at 752. Plaintiff does not plausibly allege circumstantial evidence showing that Ms. Henderson knew of a substantial risk or allege that the risk was obvious when Ms. Henderson performed Mr. Borkovec's intake, received the October 8, 2022 kite, or saw Mr. Borkovec on November 3, 2022. *See Martinez*, 563 F.3d at 1089. Accordingly, plaintiff fails to state a constitutional violation against Ms. Henderson.

### b. Ms. Jones

Ms. Jones responded to Mr. Borkovec's October 11, 2022 kite, wherein Mr. Borkovec complained of indigestion and requested medication. Docket No. 1 at 18-19, ¶ 188. Ms. Jones authorized Mr. Borkovec to take Tums/Maalox three times daily as needed. *Id*. Ms. Jones also responded to Ms. Borkovec's October 18, 2022 kite, wherein he stated that his depression and anxiety were getting worse and stated, "I've lost a lost of weight from not being able to eat the normal meals. Could I get Ensure or an [alternative] to help supplement my diet. A lot of the food make my gastroparesis worse. Will sign ROI for medical paperwork for proof." *Id.* at 23, ¶¶ 143-144. Ms. Jones placed Mr. Borkovec on weekly weight check-ins for a month in response to this kite. *Id.*, ¶ 144.

Ms. Jones argues that the complaint does not plausibly allege that she was deliberately indifferent to Mr. Borkovec's medical needs because she "reasonably responded to the specified low-level symptom, indigestion" described in Mr. Borkovec's October 11, 2022 kite. *See* Docket No. 52 at 9. Ms. Jones also argues that, one week later, in response to Mr. Borkovec's October 18, 2022 kite, she "ordered weekly weight monitoring" for Mr. Borkovec after he complained of "not being able to eat normal meals." *See id.* at 9-10.

Plaintiff responds that Ms. Jones was not only aware of the complaints in the October 11, 2022 kite and the October 18, 2022 kite, but also knew that Mr. Borkovec reported body pain, insomnia, vomiting, and extreme tooth pain in other kites that he submitted between October 11 and October 18. *See* Docket No. 80 at 8-9. Therefore, plaintiff contends that Ms. Jones knew Mr. Borkovec was a "recent IV drug user with persisting complaints of unexplained severe body pain, vomiting, and significant weight loss, and gastro issues," but did not attempt to determine his condition or administer care, or "take him up on his offer to sign a release of information, which would have revealed that he had a progressing staph bacterium." *Id.* at 9. Furthermore, plaintiff claims that Ms. Jones saw Mr. Borkovec during med pass on October 11, 12, 18, and 25, 2022, but did not fulfill her gatekeeping duties. *Id.* at 9-10.

The Court finds that the complaint does not state a claim that Ms. Jones was deliberately indifferent in response to the October 11, 2022 kite. There are no allegations that support the argument indigestion alone would indicate there was a substantial risk to Mr. Borkovec's health or that Ms. Jones drew the inference that Mr. Jones's indigestion was a symptom of a more serious health issue. *See Est. of*

*Newman,* 2025 WL 948379, at *5.  Rather, Ms. Jones reasonably responded to Mr. Borkovec's complaint of indigestion issues by granting his request for medication.

The complaint also does not plausibly allege that Ms. Jones was aware of a substantial risk to Mr. Borkovec's health due to the October 18, 2022 kite.  From that kite, Ms. Jones knew that Mr. Borkovec "lost a lot of weight" from his inability to eat normal meals, and "a lot of the food" was making Mr. Borkovec's gastroparesis worse.  Docket No. 1 at 23, ¶ 143.  Ms. Jones's knowledge of Mr. Borkovec's weight loss alone is insufficient to plausibly allege that Ms. Jones was aware of a substantial risk to Mr. Borkovec's health.  Moreover, after Mr. Borkovec submitted the October 18, 2022 kite, Ms. Jones placed him on "weekly weight checks for a month."  *Id.* at 23, ¶ 144.  Ms. Jones's decision to monitor Mr. Borkovec's weight in response to his October 18, 2022 kite fails to show that Ms. Jones ignored a substantial risk to Mr. Borkovec's health and failed to take reasonable measures to abate the risk to Mr. Borkovec.  *Cf. Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006) ("where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under [Tenth Circuit] case law").

The complaint's allegations do not support plaintiff's argument that Ms. Jones was aware of Mr. Borkovec's complaints and symptoms that were not described in the October 11 and October 18, 2022 kites.  As explained above, there is no factual support for the allegation that Ms. Jones would have reviewed kites beyond the ones she was responding to.  *See* Docket No. 1 at 24, ¶ 154.  Plaintiff merely alleges that "[a]ll of the responding nurses reviewed [Mr. Borkovec's] earlier kites and complaints, and therefore understood the critical cumulative picture."  *Id.*  Plaintiff argues that this allegation

sufficiently imputes knowledge by citing *Est. of Angelo v. Bd. of Cnty. Commissioners of Jefferson Cnty.*, No. 23-cv-01607-CNS-STV, 2024 WL 2274080 (D. Colo. May 20, 2024), for the proposition that "plaintiffs sufficiently alleged facts that LPN had knowledge of an excessive risk where patient's medical chart included earlier abnormal signs and symptoms."  *See* Docket No. 80 at 9 n.8.  *Est. of Angelo* is inapposite.  In that case, plaintiff alleged that the LPN "accessed and contributed to Ms. Angelo's medical chart, which included Ms. Angelo's previous vital signs, notably her high temperature, elevated heart rate, and low SpO2."  *Est. of Angelo*, 2024 WL 2274080 at, *9.  Here, plaintiff does not allege that the kites were included in Mr. Borkovec's chart and, even if they were, plaintiff does not allege that Ms. Henderson, Ms. Jones, Ms. Seeburger, Mr. Markling, Ms. Martinez, Ms. High, or Mr. Morrow "accessed and contributed" to Mr. Borkovec's chart.  *See id.*

Furthermore, there is no support for plaintiff's argument that Ms. Jones saw Mr. Borkovec in the Medium-B Module during med pass duties.  The complaint alleges that unspecified "Boulder nurses" and "Boulder health care workers" saw Mr. Borkovec "at med pass every day," where they disregarded Mr. Borkovec's complaints and deteriorating appearance.  *See* Docket No. 1 at 25, 26 ¶¶ 162, 166.  This is an insufficient means of attributing conduct to Ms. Jones or to any other defendant.  *See Robbins v. Oklahoma,* 519 F.3d 1242, 1250 (10th Cir. 2008) (holding that the complaint failed to state a claim pursuant to Fed. R. Civ. P. 8 where it "fails to isolate the allegedly unconstitutional acts of each defendant, and thereby does not provide adequate notice as to the nature of the claims against each").  Similarly, plaintiff's allegation that Mr. Borkovec "reported to Boulder health care workers that he was a recent IV drug user

who was experiencing severe back pain and tightness, severe diffuse body pain and soreness, ongoing inability to sleep, vomiting, extreme tooth pain, migraines, anxiety, significant weight loss, and fatigue" does not plausibly allege that Ms. Jones knew of this information.  Docket No. 1 at 24, ¶ 151.

Accordingly, plaintiff fails to state a constitutional violation against Ms. Jones, and she is entitled to qualified immunity.

### c.  Ms. Seeburger

Ms. Seeburger responded to Mr. Borkovec's October 15, 2022 kite, wherein he stated "need tramadol or nsaid for pain in body.  1 nsaid isn't enough.  If possible mix w/ muscle relaxers or melatonin for sleep at night."  Docket No. 19-20, ¶¶ 124-125.  Docket No. 1 at 19-21, ¶¶ 124, 131.  In response to the October 15, 2022 kite, Ms. Seeburger wrote, "Kite mental health for melatonin.  Not approved for Tramadol."  *Id.* at 20-21, ¶ 131.  Ms. Seeburger also responded to "at least five kites" that were submitted by Mr. Borkovec on October 16, 2022.  *Id.* at 20-21, ¶¶ 125, 131.  In the October 16, 2022 kites, Mr. Borkovec complained of vomiting, extreme toothache that caused pain and migraines, tightness in the back, insomnia, and worsening depression and anxiety.  *Id.* at 20, ¶ 125.  In response to the October 16, 2022 kites, Ms. Seeburger wrote, "Not approved for diet change."  *Id.* at 20-21, ¶ 131.

Ms. Seeburger argues that the kites she responded to did not put her "on notice of an obviously substantial risk of serious medical harm."  Docket No. 52 at 10.[8]  She

---

[8] Ms. Seeburger attaches to her motion to dismiss copies of the kites she allegedly received from Mr. Borkovec, along with her responses, and Mr. Borkovec's kite that was submitted to the mental health unit and the corresponding response.  *See* Docket No. 52 at 10 n.3; Docket No. 52-1.  Generally, a court should not consider evidence beyond the pleadings when ruling on a 12(b)(6) motion.  *Waller v. City & Cnty.*

contends that Mr. Borkovec merely reported an inability to eat Boulder County Jail's food and requested a muscle relaxer or melatonin to help him sleep.  *See id.*  Plaintiff responds that Ms. Seeburger was aware of a substantial risk of serious harm because Mr. Borkovec complained of insomnia and body pain "so severe that it was not adequately controlled with Tylenol and Aleve."  Docket No. 80 at 7.  Plaintiff contends that Mr. Borkovec submitted at least five kites in one day, reporting "a deeply concerning constellation of symptoms," including vomiting and "extreme tooth ache causing pain and migraine, tightness in back and insomnia causing lack of sleep. Depression and anxiety getting worse."  *Id.* (quoting Docket No. 1 at 20, ¶ 125).  Plaintiff argues that Ms. Seeburger knew that the combination of symptoms that Mr. Borkovec was experiencing are "signs of serious illness and infection" that required "at the very minimum, a nursing response and doctor evaluation."  *Id.*

The complaint alleges that Ms. Seeburger responded to the October 15 and October 16, 2022 kites; however, plaintiff does not plausibly allege that Ms. Seeburger saw Mr. Borkovec's other kites, as discussed regarding the claim against Ms. Jones. Therefore, the Court rejects plaintiff's argument that Ms. Seeburger knew from other kites that Mr. Borkovec was experiencing insomnia and body pain "so severe that it was not adequately controlled with Tylenol and Aleve."  *See* Docket No. 80 at 7.

The Court finds that plaintiff fails to allege that Ms. Seeburger was deliberately indifferent to a serious medical condition in response to the October 15, 2022 kite.  The

---

*of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019).  A court has "broad discretion in determining whether or not to accept materials beyond the pleadings."  *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).  The Court exercises its discretion to not consider the kites provided by Ms. Seeburger.

fact that Mr. Borkovec had body pain and was having difficulty sleeping does not impute

knowledge to Ms. Seeburger of a serious medical condition. *See* Docket No. 1 at 19-

20, ¶ 124. Ms. Seeburger responded to Mr. Borkovec's complaint of generalized body

pain by informing him that he was not authorized to receive Tramadol as requested and

that the mental health unit was the appropriate entity to authorize the use of Melatonin.

*See id.* at 20-21, ¶ 131. Plaintiff does not plausibly allege that body pain and difficulty

sleeping would indicate that there was a substantial risk to Mr. Borkovec's health or that

Ms. Seeburger drew the inference that these symptoms were indicative of a more

serious health issue. *See Est. of Newman*, 2025 WL 948379, at *5.

The Court also finds that plaintiff fails to allege that Ms. Seeburger was

deliberately indifferent in her response to the October 16, 2022 kites. Plaintiff alleges

that, from these kites, Ms. Seeburger knew that Mr. Borkovec was experiencing a

"deeply concerning constellation of symptoms, including vomiting and extreme tooth

ache causing pain and migraine, tightness in back and insomnia causing lack of sleep"

and worsening depression and anxiety. *See* Docket No. 1 at 20, ¶ 125. Plaintiff alleges

that these are "well understood symptoms of endocarditis and sepsis." *Id.*, ¶ 129.

Plaintiff also alleges that "[a]ny reasonably trained health care worker" is aware that

these are "signs that an illness has a systemic component likely caused by bacteria."

*Id.*, ¶ 128. However, while the symptoms described in the October 16, 2022 kites could

indicate an illness with a "systemic component" that is likely "caused by bacteria," that

does not mean that a reasonable health care worker would know which bacterial

infection Mr. Borkovec was suffering from, such as a serious health condition like

endocarditis and sepsis. *See id.*; *Rouster*, 749 F.3d at 447-48 ("Although the symptoms

[plaintiff] was exhibiting could well have indicated a serious medical condition,
[defendant] interpreted the symptoms as indicative of a relatively minor condition").  And
there are no further allegations that suggest Ms. Seeburger drew the inference that Mr.
Borkovec's symptoms were signs of a serious health condition.  *See Est. of Newman*,
2025 WL 948379, at *5.

Accordingly, the Court finds that plaintiff fails to state a constitutional violation
against Ms. Seeburger, and she is therefore entitled to qualified immunity.

### d.  Mr. Markling

Mr. Markling responded to Mr. Borkovec's October 17, 2022 kite, wherein he
wrote "extreme tooth ache, causes migraines."  Docket No. 1 at 22, ¶¶ 136-37.  Mr.
Markling authorized Mr. Borkovec to take Tylenol twice a day.  *Id.*, ¶ 139.

Mr. Markling argues that his response to Mr. Borkovec's October 17, 2022 kite
does not constitute deliberate indifference because he "responded by increasing Mr.
Borkovec's pain medication and referring him for additional dental examination."  *See*
Docket No. 52 at 10-11.  Plaintiff responds that the October 17, 2022 kite put Mr.
Markling on notice that Mr. Borkovec was experiencing "dental pain so extreme that it
was causing migraines."  Docket No. 80 at 8.[9]  Plaintiff argues that Mr. Markling took no
steps to determine whether the tooth pain was caused by an infection or abscess,
despite knowing that either could be life-threatening.  *Id.*  Plaintiff contends that Mr.

---

[9] Plaintiff contends that it is "plausible to infer Nurse Markling saw multiple prior
Kites in the record, complaining of severe pain all over his back and body, insomnia,
and vomiting."  Docket No. 80 at 8 n.7.  Plaintiff also states that "Markling also
administered his medications on October 9, 11, 17, and 18."  *Id.*  For the reasons
discussed previously, the allegations in the complaint do not support plaintiff's argument
that Mr. Markling saw Mr. Borkovec's prior kites or saw Mr. Borkovec during med pass
duties.

Markling's response to authorize the use of more Tylenol was a "gross dereliction of his gatekeeper duties." *Id.*

The Court finds that plaintiff fails to plausibly allege that Mr. Markling was aware of a substantial risk of serious harm and failed to take reasonable measures to abate that risk. Plaintiff alleges that "[a]ll reasonable health care workers are aware that toothaches are frequently caused by an abscess or other oral infection" and that "leaving a tooth abscess untreated can lead to life-threatening complications, including endocarditis and sepsis." Docket No. 1 at 20, ¶¶ 126-27. Even accepting that, as a reasonable health care worker, Mr. Markling was aware that toothaches are frequently caused by an abscess or oral infection that cannot be treated by Tylenol, this allegation does not make it plausible that Mr. Markling failed to respond in a reasonable manner. In fact, plaintiff alleges that Ms. Parker, a dental assistant, told Mr. Borkovec that his kite had been "referred to dental." *See id.* at 22, ¶ 141. While plaintiff alleges that Mr. Markling took "no steps to determine whether Mr. Borkovec had an infection or abscess," *see id.*, ¶ 138, plaintiff alleges a reason for him doing so: "It is outside the nurses' scope of practice to diagnose or determine the cause of abnormal vital signs or symptoms" and "Registered Nurses may form nursing diagnoses, but must convey any abnormal findings to a provider licensed to form medical diagnoses." *See id.* at 12, ¶ 67. In light of Mr. Markling authorizing Mr. Borkovec to receive Tylenol for pain relief and Mr. Borkovec being "referred to dental," it is not plausible that Mr. Markling failed to take reasonable measures to abate the risk to Mr. Borkovec. *See Mata*, 427 F.3d at 759 (holding that an RN was not deliberately indifferent where she performed an EKG

and provided no further treatment for plaintiff's chest pains, but reported the chest pains
to a nurse practitioner).

Accordingly, the Court finds that plaintiff fails to state a constitutional violation
against Mr. Markling, and he is therefore entitled to qualified immunity.

### e.  Ms. Martinez

Ms. Martinez responded to Mr. Borkovec's October 12, 2022 kite, requesting a
muscle relaxer because Tylenol and NSAIDs were not alleviating the pain in his back
and elsewhere.  Docket No. 1 at 19, ¶ 119.  Ms. Martinez responded to the kite by
speaking with Mr. Borkovec about his generalized pain on October 12, 2022 while she
was performing med pass duties.  *Id.*, ¶ 120.  Ms. Martinez "concluded that Mr.
Borkovec was faking or exaggerating his pain, charting that he was seen walking down
the stairs without difficulty, with steady gait and erect posture."  *Id.*, ¶ 121.  On
November 2, 2022, Ms. Martinez entered Mr. Borkovec's cell in the Medium-B Module
after being summoned by Ms. High.  *Id.* at 29-30, ¶¶ 197-201.  Mr. Borkovec was "very
pale" and reported to Ms. Martinez that he was "short of breath" and "had a history of
asthma."  *Id.* at 30, ¶ 201.  At this point, Mr. Borkovec's oxygen saturation levels were
"critically low at 88%."  *Id.*, ¶ 202.  After Ms. Martinez instructed Mr. Borkovec to take
"slow, deep breaths," his oxygen saturation rose to 92%.  *Id.* at 30-31, ¶¶ 206-07.  Ms.
Martinez gave Mr. Borkovec a rescue inhaler and left his cell.  *Id.* at 31, ¶¶ 208-09.  Ms.
Martinez "placed a referral" with Dr. Davis, requesting that Mr. Borkovec be given a
rescue inhaler and that his oxygen saturation be checked for the next three days.  *Id.*,
¶ 212.

Ms. Martinez argues that she was not deliberately indifferent based on her response to Mr. Borkovec's October 12, 2022 kite. *See* Docket No. 52 at 11. Mr. Borkovec complained of "generalized pain" and requested medication for relief. *See id*. Ms. Martinez contends that she denied the request because Mr. Borkovec moved down the stairs without any indication of pain and therefore "had reason to doubt Mr. Borkovec's request for additional pain medication." *See id.* On November 2, 2022, when another nurse asked Ms. Martinez to assess Mr. Borkovec after he complained of shortness of breath, Mr. Martinez contends she was not deliberately indifferent. *See id.* She notes that, after asking Mr. Borkovec to take slow, deep breaths, Mr. Borkovec's oxygen saturation levels rose from 88% to 92%. *See id.* Therefore, she argues that "an asthma attack was a reasonable explanation for his symptoms given Nurse Martinez's limited exposure to Mr. Borkovec on November 2, 2022" in support of her decision to supply Mr. Borkovec with a rescue inhaler. *See id.* Ms. Martinez argues that she then referred Mr. Borkovec to the Jail Physician, indicating that she fulfilled her "gatekeeper obligation." *See id.* at 11-12.

Plaintiff responds that, when Ms. Martinez received Mr. Borkovec's October 12, 2022 kite, Ms. Martinez "knew that severe back pain and generalized body pain are symptoms that may be related to a serious medical condition, particularly in an IV drug user." *See* Docket No. 80 at 10. Plaintiff argues that Ms. Martinez was "reckless" in concluding that Mr. Martinez was malingering his pain. *See id.* In regard to Ms. Martinez's assessment of Mr. Borkovec, plaintiff argues that Ms. Martinez's response to Mr. Borkovec's symptoms constitutes deliberate indifference because she knew that an

88% oxygen saturation coupled with the symptoms Mr. Borkovec had been

experiencing for weeks "required sending him to the ER."  *See id.*

The complaint plausibly alleges that Ms. Martinez responded to the October 12,

2022 kite; however, plaintiff does not plausibly allege that Ms. Martinez saw Mr.

Borkovec's other kites, as discussed regarding the claim against Ms. Jones.  Rather, on

October 12, 2022, Ms. Martinez only knew that Mr. Borkovec was experiencing back

and other body pain that could not be relieved by Tylenol and other NSAIDs.  *See*

Docket No. 1 at 19, ¶ 120.  Mr. Borkovec's back and body pain alone are not symptoms

that would indicate that there was a substantial risk to his health.  *See Martinez,* 563

F.3d at 1089.  And the complaint does not allege that Ms. Martinez drew an inference

from these symptoms that there was such a substantial risk of serious harm.  *See Est.*

*of Newman,* 2025 WL 948379, at *5.

The Court finds plaintiff fails to allege facts showing that Ms. Martinez was aware

that there was a substantial risk of serious harm to Mr. Borkovec on November 2, 2022.

When Mr. Borkovec arrived at the Medium-B Module on October 24, 2022, plaintiff

alleges that Mr. Borkovec was "noticeably skinny, lethargic, unable to eat, and his skin

was pale and jaundiced."  Docket No. 1 at 25, ¶ 161.  He was coughing "thick, chunky,

blood" into two milk cartons he kept near his bed and made "audible gurgling sounds"

when he breathed.  *Id.* at 28-29 ¶¶ 188-89.  Mr. Borkovec was "feverish, sweaty,

coughing, frail, and struggling to talk because it hurt so much to breathe."  *Id.* at 28,

¶ 186.  He had "dark black circles under his eyes."  *Id.* at 29, ¶191.  However, plaintiff

does not allege that Ms. Martinez observed these symptoms when she saw him on

November 2, 2022.  Plaintiff merely alleges that Mr. Borkovec was "very pale" when Ms.

Martinez saw him, which plaintiff fails to allege is indicative of a serious health condition. *Id.* at 30, ¶ 201.  The fact that Ms. Martinez knew Mr. Borkovec was having difficulty breathing and had an initial oxygen saturation level of 88% does not show that she was aware of a substantial risk of harm.  *Id.*, ¶¶ 201-02.  After taking deep breaths, Mr. Borkovec's oxygen saturation rose to 92%.  *Id.* at 30-31, ¶¶ 207.  Plaintiff alleges that this is an "abnormally low vital sign that requires immediate provider evaluation," but does not allege that this is indicative of a serious health condition.  *Id.*  Moreover, Ms. Martinez did seek immediate provider evaluation by referring him to Dr. Davis.  *See id.* at 31, ¶ 212.  The Court also finds that plaintiff does not plausibly allege that Ms. Martinez was deliberately indifferent to Mr. Borkovec's medical needs since it was reasonable for Ms. Martinez to respond to Mr. Borkovec's shortness of breath and self-report that he had a history of asthma by providing him a rescue inhaler and ordering monitoring of his oxygen saturation levels, *see id.* at 30, 31, ¶¶ 201, 208, especially after observing that Mr. Borkovec's oxygen saturation rose after taking deep breaths.

Accordingly, the Court finds that plaintiff fails to state a constitutional violation against Ms. Martinez, and she is therefore entitled to qualified immunity.

### f.   Ms. High

Ms. High responded to Mr. Borkovec's October 25, 2022 kite, wherein he complained of "persistent vomiting" and wrote "normal food is making me sick and puke. Any help is appreciated."  *Id.* at 26, ¶ 169.  Ms. High responded by writing "Request denied – not medically necessary."  *Id.*, ¶ 170.  Ms. High saw Mr. Borkovec in his cell on November 2, 2022 at 11:30 pm, after inmates alerted deputies that Mr. Borkovec appeared to be "in the throes of a medical emergency."  *Id.* at 29, 30, ¶¶ 196, 197, 199.

After summoning Ms. Martinez for a "second opinion," Ms. High left Mr. Borkovec's cell.
*Id.* at 30, ¶ 199.

Ms. High argues that the two instances where she allegedly interacted with Mr.
Borkovec are insufficient to show that she was deliberately indifferent. *See* Docket
No. 48 at 8-10. Ms. High argues that her denial of Mr. Borkovec's request in the
October 25, 2022 kite does not constitute deliberate indifference because "a complaint
that normal food is making someone sick and puke is not inherently an indication of a
serious infection." *Id*. at 9. Regarding her encounter with Mr. Borkovec on November 2,
2022, she argues that the complaint does not allege that she "played any role
whatsoever in the treatment following her leaving the care of Mr. Borkovec in the hands
of RN Deyanira Martinez" and that Ms. High's "decision to seek a second opinion,
without further facts is insufficient to show that Nurse High showed a deliberate
indifference to Mr. Borkovec's medical needs." *Id.* at 9-10.

Plaintiff argues that when Ms. High received Mr. Borkovec's October 25, 2022
kite, she knew that Mr. Borkovec had reported "such persistent and severe vomiting that
he was losing weight, and that nothing had been done to eliminate serious causes."
*See* Docket No. 72 at 8. Plaintiff contends that Ms. High's "flat denial" of Mr. Borkovec's
request without any assessment or referral constitutes abdication of her gatekeeper
duties and a complete denial of medical care. *See id.* Furthermore, plaintiff argues that
by the time Ms. High saw Mr. Borkovec on November 2, 2022, Mr. Borkovec looked
"gravely ill." *See id.* at 12. Plaintiff argues that Ms. High's response to Mr. Borkovec's
condition, to spend "less than four minutes with him" before summoning Ms. Martinez,
constitutes deliberate indifference. *See id*. at 13-14.

The Court finds that Ms. High was not aware of a substantial risk of serious harm when she received Mr. Borkovec's October 25, 2022 kite. Mr. Borkovec's kite stated "normal food is making me sick and puke. Any help is appreciated." Docket No. 1 at 26, ¶ 169. As discussed regarding Ms. Jones, the complaint's allegations do not support plaintiff's argument that Ms. High was aware of Mr. Borkovec's symptoms recorded outside the October 25, 2022 kite. Specifically, the complaint does not plausibly allege that Ms. High knew Mr. Borkovec was experiencing "persistent and severe vomiting" resulting in weight loss. *See* Docket No. 72 at 8-9.[10] Ms. High's knowledge of Mr. Borkovec's inability to digest "normal food" and his vomiting does not make it plausible that she was aware of a substantial risk. *See Quintana,* 973 F.3d at 1029 (holding that "frequent vomiting alone" does not present an obvious risk that satisfies the subjective inquiry).

Furthermore, the Court finds that Ms. High was not aware of a substantial risk of serious harm to Mr. Borkovec when she saw him on November 2, 2022. When Mr. Borkovec arrived at the Medium-B Module, plaintiff alleges that Mr. Borkovec was "noticeably skinny, lethargic, unable to eat, and his skin was pale and jaundiced." *See* Docket No. 1 at 25, ¶ 161. Plaintiff also alleges that Mr. Borkovec was vomiting "thick, chunky, blood" into two milk cartons he kept near his bed and made "audible gurgling

---

[10] Plaintiff argues that is it "reasonable to infer that [Ms. High] accessed and reviewed Mr. Borkovec's medical record in reaching a determination about what was (and wasn't) medically necessary for her patient." Docket No. 72 at 10. The factual allegations plaintiff cites in support of this argument do not support this inference. Plaintiff merely cites to its conclusory allegation, which the Court will not consider as explained above, that "[a]ll of the responding nurses reviewed [Mr. Borkovec's] earlier kites and complaints, and therefore understood the critical cumulative picture." *See* Docket No. 1 at 24, ¶ 154.

sounds when he breathed," among other symptoms.  *See id.* at 28-29, ¶¶ 188-89.
However, plaintiff does not allege that Mr. Borkovec was exhibiting these symptoms the
day that Ms. High saw him.  Plaintiff alleges that Ms. High saw Mr. Borkovec for "less
than four minutes" and does not allege what symptoms Ms. High observed at that time.
*See id.* at 30, ¶ 199.  Even if Ms. High saw that Mr. Borkovec was "very pale," *see id.*,
¶ 201, as Ms. Martinez allegedly did, there are no allegations such observation would
have put Ms. High on notice of a serious medical condition or that she would have
drawn such an inference.  *See Est. of Newman*, 2025 WL 948379, at *5.  Furthermore,
it was reasonable for Ms. High to defer care to Ms. Martinez.  Plaintiff alleges that an
LPN, such as Ms. High, could not "form nursing diagnoses."  Docket No. 1 at 12, ¶ 67.
However, Ms. Martinez, as an RN, could form such diagnoses and was able to convey
any "abnormal findings" to a provider.  *Id.*

Accordingly, the Court finds that plaintiff fails to state a constitutional violation
against Ms. High.

### g.  Mr. Morrow

Mr. Morrow responded to Mr. Borkovec's October 21, 2022 kite, wherein Mr.
Borkovec wrote that he "came down with [a] cold before transfer to inmate worker,
makes me feel fatigued and sore."  *Id.* at 23, ¶ 147.  Mr. Morrow authorized Mr.
Borkovec to take Mucinex twice daily for five days.  *Id.* at 24, ¶ 150.

Mr. Morrow argues that the complaint "alleges only one cursory fact related to
Mr. Morrow," arising out of Mr. Borkovec's October 21, 2022 kite.  *See* Docket No. 49 at
7.  Plaintiff argues that Mr. Morrow "did not perform any assessment or take any vital
signs in response to this kite."  *See* Docket No. 71 at 8-10.  Plaintiff contends that Mr.

Morrow "knew about significantly more symptoms than breakthrough soreness and fatigue" and saw that Mr. Borkovec looked "gravely ill."  *See id.* at 11-12, 13.

The complaint plausibly alleges that Mr. Morrow responded to the October 21, 2022 kite; however, plaintiff does not plausibly allege that Mr. Morrow saw Mr. Borkovec's other kites, as discussed regarding the claim against Ms. Jones.  Outside the October 21, 2022 kite, the complaint only plausibly alleges that Mr. Morrow knew Mr. Borkovec was taking Tylenol and an antihistamine for body pain.  *See* Docket No. 1 at 24, ¶ 150.  Furthermore, as discussed regarding Ms. Jones, the complaint does not plausibly allege that Mr. Morrow saw Mr. Borkovec while performing med pass duties or at any other time.  *See* Docket No. 71 at 14.  Therefore, the Court will only consider whether Mr. Morrow was aware of a substantial risk of serious harm based on the October 21, 2022 kite and the knowledge that Mr. Borkovec was currently taking Tylenol and an antihistamine.

In the October 21, 2022 kite, Mr. Borkovec stated that he "came down with [a] cold before transfer to inmate worker, makes me fatigued and sore."  Docket No. 1 at 23, ¶ 147.  In response, Mr. Morrow authorized Mr. Borkovec to have Mucinex twice a day for five days, noting that Mr. Borkovec was already taking Tylenol and an antihistamine.  *Id.* at 24, ¶ 150.  The Court finds that these allegations do not plausibly show that Mr. Morrow was aware of a substantial risk of serious harm to Mr. Borkovec's health.  Plaintiff fails to allege that Mr. Borkovec's complaint of a cold and consistent soreness obviously indicated that Mr. Borkovec was suffering a serious condition or that Mr. Morrow inferred that Mr. Borkovec's "cold" or body pain was a symptom of a serious condition.  *See Martinez,* 563 F.3d at 1089*; Est. of Newman*, 2025 WL 948379, at \*5.

39

Accordingly, plaintiff fails to state a constitutional violation against Mr. Morrow.[11]

### h. Ms. Samuels

Ms. Samuels responded to Mr. Borkovec's October 27, 2022 kite, complaining of a "persistent cough that was keeping him up at night" and that he was "still sick." Docket No. 1 at 27, ¶ 173.  Ms. Samuels "took Mr. Borkovec's vital signs or directed them to be taken."  *Id.*, ¶ 174.  From these vital signs, Ms. Samuels knew that Mr. Borkovec had an oxygen saturation of 93% and that his pulse was 137 bpm.  *Id.*, ¶ 175. Ms. Samuels ordered Mr. Borkovec to receive a decongestant, Tylenol, and cough syrup for five days.  *Id.*, ¶ 179.  She charted that Mr. Borkovec was not experiencing any acute distress.  *Id.*, ¶ 178.

Ms. Samuels argues that the complaint "fails to set forth any well-pleaded factual allegations establishing a culpable mental state as to NP Samuels."  Docket No. 64 at 9. She notes that Mr. Borkovec "complained to NP Samuels of feeling sick" and "in response she recommended a decongestant, pain/anti-inflammatory medications and cough syrup."  *Id.*

Plaintiff responds that Ms. Samuels was the "only provider capable of forming a diagnosis who ever saw Borkovec" and therefore she was "uniquely positioned to get him the care and treatment he so obviously required."  Docket No. 91 at 8-9.  Plaintiff

---

[11] In response to Mr. Morrow's motion to dismiss, plaintiff requests that, to the extent the Court finds that the complaint fails to sufficiently allege facts concerning Mr. Morrow's knowledge of Mr. Borkovec's symptoms, it be permitted "an opportunity to amend the Complaint."  *See* Docket No. 71 at 4 n.3.  Plaintiff's motion for leave to amend the complaint, included in its response, violates the Local Rules of this Distrct. *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").  Plaintiff's request also does not comply with the Local Rules governing the filing of amended pleadings.  *See* D.C.COLO.LCivR 15.1.

contends that Ms. Samuels knew from her "own incomplete exam that Borkovec had

been sick for weeks, that he was not maintaining normal blood oxygen saturations, and

that his heart rate was extremely elevated." *Id.* at 9. Furthermore, plaintiff argues that

Ms. Samuels saw that Mr. Borkovec was "skinny, lethargic, pale, jaundiced" and was

"so obviously gravely ill." *Id.* at 5.

Plaintiff does not allege that Ms. Samuels saw Mr. Borkovec in-person and was

therefore able to see the serious symptoms Mr. Borkovec displayed by the time he was

transferred to the Medium-B Module. The complaint only alleges that Ms. Samuels

"took Mr. Borkovec's vital signs or directed them to be taken." *Id.* at 27, ¶ 174. The

complaint alleges that Ms. Samuels ordered Mr. Borkovec to "receive a decongestant,

Tylenol, and cough syrup," but does not allege whether Mr. Samuels issued this order

in-person or through the kite system. *See id.*, ¶ 179. Therefore, the symptoms that Mr.

Borkovec displayed in-person cannot be the basis for Ms. Samuels's awareness of a

substantial risk of serious harm Mr. Borkovec's health.

Plaintiff further alleges that Ms. Samuels "knew from earlier charting that Mr.

Borkovec had been complaining of severe back pain and tightness, severe diffuse body

pain and soreness, ongoing inability to sleep, vomiting, extreme tooth pain, migraines,

anxiety, significant weight loss, and fatigue for weeks." *Id.* at 28, ¶ 180. Plaintiff alleges

that Ms. Samuels knew that Mr. Borkovec was a "recent IV drug user at a high risk of

contracting a blood-borne infection, that he was pale, coughing, and unable to eat." *Id.*,

¶ 181. Plaintiff alleges that Ms. Samuels also knew that Mr. Borkovec was coughing up

blood because Mr. Borkovec told "inmates and nurses with whom she worked" that he

was coughing up blood. *Id.* The Court disregards these allegations as they are

assertions devoid of further factual enhancement. *See Ashcroft*, 556 U.S. at 678. The complaint does not allege that Mr. Borkovec's back pain, sleep issues, vomiting, tooth pain, migraines, anxiety, weight loss, and fatigue were ever "charted." Rather, these symptoms were communicated in previous kites that other medical providers responded to. Plaintiff does not allege facts that make it plausible that Ms. Samuels reviewed prior kites. Furthermore, plaintiff's assertion that Ms. Samuels knew Mr. Borkovec was coughing up blood – because he told other inmates and nurses that Ms. Samuels worked with – is too speculative to support plaintiff's allegation that Mr. Borkovec knew about this symptom. Plaintiff does not allege that Ms. Samuels spoke with other inmates or nurses about Mr. Borkovec.

The Court will only consider the well-pled allegations that support Ms. Samuels's awareness of Mr. Borkovec's symptoms. Ms. Samuels reviewed Mr. Borkovec's October 27, 2022 kite, wherein he stated that he was "still sick" and had a "persistent cough that was keeping him up at night." *See* Docket No. 1 at 27, ¶ 173. Ms. Samuels knew that Mr. Borkovec's "oxygen saturation was abnormally low at 93%" and "his pulse was extremely elevated at 137 bpm." *Id.*, ¶ 175. A normal pulse for healthy adults is 60 to 100 beats per minute and a pulse outside this range is an "abnormal vital sign." *See id*. at 11, ¶ 62. A high pulse is indicative of sepsis and septic shock, and a high pulse coupled with low blood oxygen saturation is a "danger sign of lung infection." *Id.* at 27, ¶ 176. The Court finds that these allegations plausibly allege that Ms. Samuels was aware of a substantial risk of serious harm after she reviewed Mr. Borkovec's vitals. *See Bryant v. Buck,* 793 F. App'x 979, 985 (11th Cir. 2019) (unpublished) (because a nurse knew that the inmate, who later died from septic shock, "recently sustained dog

42

bites, that his pulse and respiratory rate were elevated, and that he had complained about dizziness and weakness," the nurse was "aware of [the inmate's] serious medical needs . . . because there was ample evidence that he was suffering"); *Est. of Angelo*, 2024 WL 2274080, at *11 (finding that plaintiff plausibly alleged that a nurse was deliberately indifference because she "was aware of additional concerning symptoms: abdominal cramping and [inmate's] low body temperature, which Plaintiffs allege is often a sign of sepsis").

The Court finds that Ms. Samuels failed to take reasonable measures to abate risk to Mr. Borkovec, as both a gatekeeper and on a failure to properly treat theory. Upon reviewing these serious symptoms, Ms. Samuels ordered Mr. Borkovec to receive a decongestant, Tylenol, and cough syrup.  Docket No. 1 at 27, ¶ 179.  "[P]roviding only *some* modicum of treatment is not sufficient to absolve defendants from liability for potential deliberate indifference to plaintiff's serious medical concerns."  *Lucas*, 58 F.4th at 1139 (quoting *Plunkett v. Armor Corr. Health Servs., Inc.*, 2022 WL 889962 at *6 (N.D. Okla. Mar. 25, 2022) (alterations omitted)).  Despite Mr. Borkovec complaining of a cough and exhibiting low oxygen saturation, Ms. Samuels did not obtain a respiratory rate.  Docket No.1 at 27, ¶ 177.  She did not order further testing or order that Mr. Borkovec be under observation.  *Id.* at 28, ¶ 180; *see Est. of Taylor,* 2024 WL 3874954, at *13 (holding that plaintiff adequately pled liability based on a "failure to treat" theory where defendant only gave the decedent anti-nausea medications and was not given a cardiovascular evaluation or medication to treat his chest pains).  As a gatekeeper, Ms. Samuels failed to obtain further care for Mr. Borkovec and instead noted in his chart that he was not "experiencing any acute distress."  Docket No. 1 at 27, ¶ 178.

Therefore, plaintiff plausibly alleges that Ms. Samuels was deliberately indifferent to a substantial risk of serious harm to Mr. Borkovec as both a provider and gatekeeper. Plaintiff states a constitutional violation against Ms. Samuels.

### 2. Clearly Established Law

Although plaintiff plausibly alleges that Ms. Samuels violated Mr. Borkovec's constitutional rights, she is only liable if plaintiff shows that she violated clearly established law. Ms. Samuels argues that the "law is clear that treatment of an inmate or detainee with nebulous, non-specific symptoms does not rise to the level of deliberate indifference." Docket No. 64 at 10. Plaintiff responds that Ms. Samuels "[d]enying and delaying emergency care for Borkovec's ongoing worsening condition in the face of vital signs and symptoms 'indicating a need for urgent medical attention,' and leaving him to languish and suffer for another week until he died, was unquestionably unconstitutional.'" Docket No. 91 at 15 (quoting *Kellum v. Mares*, 657 F. App'x 763, 769 (10th Cir. 2016) (unpublished)); *Mata*, 427 F.3d at 751.

The Court finds that plaintiff has met its burden to show that Ms. Samuels violated clearly established law. While Ms. Samuels characterizes the symptoms she observed as being "non-specific" and not indicating a serious condition, the Court disagrees. As described above, Ms. Samuels knew that Mr. Borkovec's "oxygen saturation was abnormally low at 93%" and "his pulse was extremely elevated at 137 bpm." Docket No. 1 at 27, ¶ 175. She knew that these symptoms were a "danger sign of lung infection" and sepsis. *Id.*, ¶ 176. Ms. Samuels knew that Mr. Borkovec had a persistent illness and cough. *Id.*, ¶ 173.

"Tenth Circuit case law consistently instructs that 'when [an inmate] has obvious and serious medical needs, ignoring those needs necessarily violates the [inmate's] constitutional rights.'" *Est. of Kowalski v. Shrader*, No. 21-Ccv-00827-NYW, 2022 WL 19422, at *12 (D. Colo. Jan. 3, 2022) (quoting *Quintana*, 973 F.3d at 1033). "[T]here is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right," and "[t]his principle also clearly 'applies to pretrial detainees through the due process clause of the Fourteenth Amendment.'" *Est. of Booker v. Gomez*, 745 F.3d 405, 433 (10th Cir. 2014) (quoting *Mata*, 427 F.3d at 749; *Howard v. Dickerson,* 34 F.3d 978, 980 (10th Cir.1994)); *see also Est. of Jensen by Jensen v. Clyde,* 989 F.3d 848, 860 (10th Cir. 2021) ("in January 2016 . . . it had been 'clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights'") (quoting *Quintana,* 973 F.3d at 1033). It was clear by 2022 that Ms. Samuels's lack of knowledge of Mr. Borkovec's underlying condition does not shield her from liability where she know that Mr. Borkovec was exhibiting symptoms that showed there was a substantial risk of serious harm. *Self*, 439 F.3d at 1232 (holding that the "obviousness" of a serious medical need can arise where plaintiff shows that a "medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency").

In sum, by 2022, a reasonable person in Ms. Samuels's position would have known that her conduct violated Mr. Borkovec's clearly established constitutional rights. *See Harlow*, 457 U.S. at 818. Accordingly, the Court finds that plaintiff has met its

burden to overcome Ms. Samuels's qualified immunity defense.  The Court will deny

Ms. Samuels's motion to dismiss Claim One.

### B.  Claim Two – *Monell* Claim

Local governments may not be sued under 42 U.S.C. §1983 on a theory of

respondeat superior.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978).

Instead, local governing bodies can be sued directly only where "the action that is

alleged to be unconstitutional implements or executes a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at

690 (footnote omitted).  "[I]t is when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible

under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a

municipal employee, a plaintiff must allege sufficient facts to demonstrate that it is

plausible (1) that the municipal employee committed a constitutional violation; and (2)

that a municipal policy or custom was the moving force behind the constitutional

deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal

policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom
> amoun[ting] to a widespread practice that, although not authorized
> by written law or express municipal policy, is so permanent and well
> settled as to constitute a custom or usage with the force of law; (3)
> the decisions of employees with final policymaking authority; (4) the
> ratification by such final policymakers of the decisions – and the
> basis for them – of subordinates to whom authority was delegated
> subject to these policymakers' review and approval; or (5) the
> failure to adequately train or supervise employees, so long as that
> failure results from 'deliberate indifference' to the injuries that may

be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A plaintiff must demonstrate "a direct causal link between the policy or custom

and the injury alleged." *Id.* at 788 (internal quotation marks omitted). "Where a plaintiff

claims that the municipality has not directly inflicted an injury, but nonetheless has

caused an employee to do so, rigorous standards of culpability and causation must be

applied to ensure that the municipality is not held liable solely for the actions of its

employee." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405

(1997). "The causation element is applied with especial rigor when the municipal policy

or practice is itself not unconstitutional, for example, when the municipal liability claim is

based upon inadequate training, supervision, and deficiencies in hiring." *Schneider v.*

*City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Thus, in order

to state a claim under *Monell*, a plaintiff must allege an "(1) official policy or custom, (2)

causation, and (3) state of mind." *Id*. at 769.

### 1. Monell *Claim Against Sheriff Johnson*

Sheriff Curtis Johnson[12] is the Boulder County Sheriff and is the final policy

maker for Boulder County in matters concerning the Sheriff's Office, which includes

Boulder County Jail. Docket No. 1 at 7, ¶ 31. Mr. Borkovec was incarcerated at

Boulder County Jail from October 7, 2022 until his death on November 3, 2022. *See id.*

at 17, 35, ¶¶ 107, 237. Plaintiff brings a *Monell* claim against Sheriff Johnson in his

---

[12] Because Sheriff Johnson is sued in his official capacity, the claim asserted against him is "essentially another way of pleading an action" against Boulder County. *See Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010).

official capacity for a custom, policy, and practice of providing deliberately indifferent

medical care to inmates at Boulder County Jail.  *See id.* at 54-55, ¶ 284.

### a.  Constitutional Violation

To maintain a municipal liability claim, a plaintiff must first show that a municipal

employee violated the plaintiff's constitutional rights.  *See Jiron*, 392 F.3d at 419.

Sheriff Johnson does not challenge this element, *see* Docket No. 51 at 5, and, as

described above, the Court finds that plaintiff has plausibly alleged that Boulder County

municipal employee Jennifer Samuels violated plaintiff's constitutional rights.  For the

purposes of resolving Sheriff Johnson's motion to dismiss, therefore, the Court assumes

that plaintiff has adequately pled a constitutional violation against Boulder County.

### b.  Municipal Policy or Custom

A plaintiff must also show that a municipal policy or custom was the moving force

behind the constitutional deprivation.[13]  *See Jiron,* 392 F.3d at 419.  Sheriff Johnson

---

[13] Plaintiff alleges that Sheriff Johnson is "liable under the non-delegable duty
doctrine for the deliberately indifferent policies of Defendant Maxim."  Docket No. 1 at 7,
61, ¶¶ 34, 323.  However, plaintiff does not allege any policies or customs of Maxim, but
only those of Boulder County Jail.  *See id.* at 53-56; *Est. of Walter by & through
Klodnicki v. Corr. Healthcare Companies, Inc.*, 323 F. Supp. 3d 1199, 1216 (D. Colo.
2018) ("the question is not whether the County itself promulgated an unconstitutional
policy or had notice of problems caused by [the contractor's] policy, but whether [the
contractor] had an unconstitutional policy and otherwise satisfies the Monell
requirements"); *Est. of Angelo*, 2024 WL 2274080, at *19 ("To establish liability against
a public entity under the non-delegable duty doctrine, a plaintiff must present evidence
that the third party satisfies the three *Monell* requirements: that the third party
promulgated a policy or custom, that the policy or custom was the moving force behind
the violation of the plaintiff's constitutional right, and that the third party enacted or
maintained the policy with deliberate indifference to an almost inevitable constitutional
injury.") (internal quotations and citation omitted).  Plaintiff does not argue that Boulder
County Jail is liable on a non-delegable duty theory in response to Boulder County Jail's
motion to dismiss, but only on a theory of direct liability.  *See* Docket No. 81.  The
parties stipulated to Maxim's dismissal as a defendant on January 3, 2025.  *See* Docket

argues that plaintiff's allegations of there being an "informal custom" at Boulder County

of deliberately indifferent policies lack factual support.  *See* Docket No. 51 at 4-9.  He

contends that the complaint "sets forth only a single allegedly similar incident" involving

Boulder County.  *Id.* at 6.  Plaintiff responds it alleges that, "for almost a month, nurse

after nurse disregarded [Mr. Borkovec's] serious medical complaints and refused to call

a provider or send him to the hospital."  Docket No. 81 at 11-12.  Plaintiff contends that

it is "not actually required to prove a pattern of similar incidents using *other* inmates"

and can instead "show Boulder's customs by the pattern of every nurse who interacted

with Borkovec."[14]  Docket No. 81 at 14.

Plaintiff appears to allege that Boulder County had a policy or custom because

(1) Boulder County has a widespread custom of tolerating practices that results in

---

No. 73.  Accordingly, the Court will dismiss that portion of Claim Two that is asserted
against Sheriff Johnson on a non-delegable duty theory.

    [14] In response to the motions to dismiss, plaintiff relies on allegations in *Wamsley
v. Johnson*, Case No. 24-cv-01425-NYW-SBP (D. Colo. Jan. 3, 2025), as a source of
"additional support to Plaintiff's allegations that Boulder maintains certain polices,
customs and practices."  *See* Docket No. 81 at 12-13.  Generally, a court should not
consider evidence beyond the pleadings when ruling on a 12(b)(6) motion.  *Waller v.
City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019).  However, the Tenth
Circuit has recognized a "limited exception" to this rule: the "district court may consider
documents referred to in the complaint if the documents are central to the plaintiff's
claim and the parties do not dispute the documents' authenticity."  *Id.* (citation omitted);
*see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th
Cir. 1997) (recognizing that "if a plaintiff does not incorporate by reference or attach a
document to its complaint, but the document is referred to in the complaint and is
central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to
the court to be considered on a motion to dismiss").  However, a court has "broad
discretion in determining whether or not to accept materials beyond the pleadings."
*Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).  When a court takes
judicial notice of documents, it may do so only to "show their contents, not to prove the
truth of the matters asserted therein."  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th
Cir. 2006) (citation omitted).  Because plaintiff does explain why the Court should take
judicial notice of the *Walmsey* complaint and consider these allegations beyond the
pleadings, the Court declines to do so.

deliberately indifferent medical care; (2) final policymakers at Boulder County ratify

decisions of subordinates that results in deliberately indifferent medical care; and (3)

Boulder County has a policy of failing to train its officers, which results in the provision

of deliberately indifferent medical care.  *See* Docket No. 1 at 61-62, ¶¶ 322-327.

Plaintiff alleges that Boulder County has a policy or custom of "deliberately indifferent

medical care and obtaining medical care by medical and custodial staff in [Boulder

County Jail]," which includes:

> (1) not obtaining or reviewing outside medical records;
> (2) responding to medical complaints without taking complete vital signs or performing any assessment;
> (3) considering and treating each symptom in isolation with over the counter medications;
> (4) craning to find benign causes for even serious symptoms;
> (5) failing to obtain diagnostic tests and labs when indicated;
> (6) ignoring life-threatening symptoms;
> (7) failing to refer inmates for higher level evaluation and treatment, or send them to the hospital, even when necessary to prevent serious injury or death;
> (8) allowing and training nurses to practice outside their nursing scope;
> (9) a widespread custom and tolerated practice and habit of disregarding inmate complaints and symptoms as exaggerated,
> faked, benign, or caused by drug use; and
> (10) conducting cursory custodial checks on inmates.

*Id.* at 61, ¶ 322.

   ***Informal Custom Amounting to a Widespread Practice.***  Municipalities may

"incur liability when they adopt unconstitutional 'longstanding practice[s] or custom[s]'

that become 'standard operating procedure[s].'"  *Murphy v. City of Tulsa*, 950 F.3d 641,

649 (10th Cir. 2019) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

"In attempting to prove the existence of such a continuing, persistent and widespread

custom, plaintiffs most commonly offer evidence suggesting that similarly situated

individuals were mistreated by the municipality in a similar way."  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotations omitted).

Plaintiff cites *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 WL 7755975, at *1 (D. Colo. Dec. 2, 2015), for the proposition that it can show the existence of an informal custom by only relying on alleged instances of misconduct that impacted Mr. Borkovec and is not "actually required to prove a pattern of similar incidents using *other* inmates." *See* Docket No. 81 at 14.  The Court finds that *Arakji* is distinguishable and does not stand for this proposition.  As an initial matter, the plaintiff in *Arakji* proceeded pro se and was therefore entitled to a liberal construction of his complaint.  *See Arakji*, 2015 WL 7755975, at *6.  Here, plaintiff is represented by counsel and is therefore not entitled to such liberal construction.  Furthermore, the plaintiff in *Arakji* alleged "with a high degree of factual specificity, incidents on twelve occasions within a one-year period" in which "numerous Broomfield police officers persistently harassed him while he slept in his car."  *Id.*[15]  By contrast, as described above, the Court finds that plaintiff plausibly alleges one instance of deliberately indifferent medical care by Ms. Samuels that occurred on or about October 27, 2022.  The Court finds that this is insufficient to allege a "widespread" custom that is "so permanent and well settled as to constitute a custom or usage with the force of law."  *See Bryson*, 627 F.3d at 791 (citation omitted); *see also Yelton v. Bd. of Cnty. Comm'rs of Canadian Cnty.,* 2024 WL 4415249, at *5 (W.D. Okla. Mar. 18, 2024) ("Similar conduct performed by multiple employees does not

---

[15] Similarly, plaintiff's reliance on *Est. of Amy Lynn Cross v. Turn Key Health Clinics*, Case No. 22-cv-03143-DDD-NRN, Docket No. 60 at 6-7 (D. Colo. July 18, 2023), is unavailing because, there, plaintiff alleged "specific characteristics for each of the eighteen cases" of defendant's "alleged misbehavior" in support of its *Monell* claim.

amount to a practice or custom if the conduct was only directed toward one person.")
(citing *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995)); *Hernandez v. City &
Cnty. of Denver,* No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *6 (D. Colo. Aug.
23, 2022) (holding that four incidents of excessive force were insufficient to establish an
informal custom, even where plaintiff alleged the existence of victims other than
plaintiff).

Plaintiff alleges only one other instance in support of its informal and widespread
custom theory.  On September 7, 2022, plaintiff alleges that Kip Zwickel, an inmate at
Boulder County Jail, "died from methamphetamine intoxication after attempting to get
medical attention the entire night by knocking on his cell door."  Docket No. 1 at 55-56,
¶ 288.  "Generally, a single incident is insufficient to establish a policy or practice for a
municipal liability claim."  *Est. of Marciano Briones v. Adams Cnty.*, No. 18-cv-00865-
PAB-MEH, 2020 WL 6343343, at *6 (D. Colo. Oct. 29, 2020) (collecting cases).
Moreover, plaintiff's allegation regarding Mr. Zwickel's death is devoid of factual support
that permits the Court to determine whether Mr. Zwickel was similarly situated to Mr.
Borkovec and treated in a similar way.  *See Carney*, 534 F.3d at 1274.

Accordingly, the Court finds that plaintiff does not plausibly allege a *Monell* claim
against Sheriff Johnson on a theory of there being an informal custom that amounts to a
widespread practice.

***Ratification by Final Policymakers.***  Plaintiff alleges that Boulder County,
"through policy makers and final delegated decision-makers, ratified their employees
and subordinates unconstitutional conduct by approving their decisions and the basis
for them, including ongoing toleration of the known widespread culture of ignoring

inmates' serious medical conditions, in part to save money."  Docket No. 1 at 62, ¶ 327.

However, there are no other allegations that suggest plaintiff is proceeding on a

ratification theory of liability.  For instance, plaintiff does not allege facts that show an

affirmative approval from a final policymaker.  *See Twitchell v. Hutton*, No. 10-cv-01939-

WYD-KMT, 2011 WL 318827, at *5 (D. Colo. Jan. 28, 2011) (citing *Brammer–Hoelter v.*

*Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)).  Furthermore, Sheriff

Johnson states that the complaint "relies only on allegations of 'informal custom,'" *see*

Docket No. 51 at 5, and, in response, plaintiff does not argue that it is proceeding on a

ratification theory of liability and focuses only on its argument that there exists an

informal custom.  *See* Docket No. 81.

Accordingly, the Court finds that plaintiff does not plausibly allege a *Monell* claim

against Sheriff Johnson on a theory of ratification.

**Failure to Train**.  To state a *Monell* claim based on the failure to train or

supervise, a plaintiff must sufficiently allege that the failure "amounts to deliberate

indifference to the rights of persons with whom the [official] come into contact."  *Harris*,

489 U.S. at 388.  However, "[a] municipality's culpability for a deprivation of rights is at

its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61; *see*

*also Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion) ("a 'policy' of

'inadequate training'" is "far more nebulous, and a good deal further removed from the

constitutional violation, than was the policy in *Monell*").

Plaintiff alleges that Boulder County is "directly liable . . . for its deliberately

indifferent training and supervision of nurses."  Docket No. 1 at 61, ¶ 322.  There are no

further allegations that support plaintiff's theory of liability based on a failure to train.

53

Plaintiff does not set forth facts concerning how Boulder County Jail medical staff were trained or who trained them.  *See Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1072 (D. Colo. 2021) (finding the plaintiff's failure-to-train allegations insufficient where the plaintiff did not provide allegations about how the officers were trained and who trained them); *Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192,1208 (D. Colo. 2020) (dismissing *Monell* claim for failure to allege specific facts regarding the officers' training, did not identify individuals that allegedly failed to adequately supervise or train, and did not contain allegations establishing a pattern of similar conduct); *Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained but had not "allege[d] specific deficiencies in training and supervision, or explain[ed] how the incident described in the Amended Complaint could have been avoided with different or better training and supervision").  Furthermore, Sheriff Johnson argues, that because "Plaintiff does not elaborate any facts regarding County policy or develop any theory regarding failure to train, the County does not discuss them further in this motion."  *See* Docket No. 51 at 5 n.3.  In response, plaintiff does not argue that it has plausibly alleged liability on a failure to train theory and only focuses on its allegations concerning an informal custom.  *See* Docket No. 81.

Accordingly, the Court finds that plaintiff does not plausibly allege a *Monell* claim against Sheriff Johnson on a failure to train theory.  Because plaintiff does not plausibly

allege a *Monell* claim against Sheriff Johnson on any theory, the Court will dismiss claim two against Sheriff Johnson without prejudice.[16]

### 2. *Direct Liability* **Monell** *Claim Against Broomfield*

Mr. Borkovec was an inmate at Broomfield Detention Center from September 29, 2022 to October 6, 2022.  Docket No. 1 at 13, 17, ¶¶ 76, 107.  Broomfield is a Colorado municipal corporation that is responsible for Broomfield Detention Center.  *Id.* at 4, ¶ 18.  Plaintiff brings claims arising out of Broomfield's "own deliberately indifferent policies" and for the "deliberately indifferent policies and practices" of Turn Key, which Broomfield contracted with to provide healthcare services to Broomfield Detention Center inmates.  *Id.*, ¶ 20.

### a. Constitutional Violation

Broomfield does not challenge this element.  *See* Docket No. 46 at 5-10.  Therefore, for the purposes of resolving Broomfield's motion to dismiss, the Court

---

[16] Sheriff Johnson requests that plaintiff's *Monell* claim be dismissed with prejudice.  Docket No. 51 at 9.  "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).  Because Sheriff Johnson does not explain why amendment of the complaint would be futile, and the Court does not find that amendment would necessarily be futile, the Court will dismiss the *Monell* claim without prejudice.  *See Ryberg on behalf of Ryberg v. City & Cnty. of Denver,* No. 13-cv-02333-CMA-KLM, 2014 WL 4067170, at *2 (D. Colo. Aug. 13, 2014) ("Plaintiff has failed to state a claim of municipal liability against Defendant City and County of Denver and, therefore, that claim is . . . dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(6)."); *Cuervo v. Salazar*, No. 20-cv-0671-WJM-GPG, 2021 WL 1534607, at *5 (D. Colo. Apr. 19, 2021) (dismissing *Monell* claims without prejudice where the complaint "contains no allegations establishing *Monell* liability under any of the five methods by which a plaintiff may to do so in the Tenth Circuit").

assumes that plaintiff has adequately pled a constitutional violation against Broomfield.

### b. Municipal Policy or Custom

Broomfield argues that plaintiff's allegations "fail[] to identify a specific policy" and that they "amount to nothing more than threadbare recitals of certain elements of a Section 1983 claim." *See id.*at 8. It argues that plaintiff "does not allege the requisite scienter and a direct causal link between any policy or custom and any alleged constitutional violation." *Id.* at 9. With regards to plaintiff's "failure to train and supervise theory," Broomfield argues that the allegations are "likewise entirely conclusory and lacking in factual detail." *Id.*

Plaintiff alleges the following regarding the Broomfield's policies:

Defendants Turn Key and Broomfield maintain unconstitutional customs, practices, and polices, including (1) disregarding and minimizing inmates' medical complaints; (2) delaying or denying indicated testing and treatment; (3) failing to timely send patients to the hospital; (4) understaffing; (5) using nurses to practice medicine recklessly outside their scope; and (6) transferring patients without necessary continuity of care records.

Docket No.1 at 37-38, ¶ 249. The Court construes plaintiff's allegations to be asserting the existence of an informal custom because plaintiff does not allege the existence of a formal policy, that decisions of employees with final policymaking authority constitute municipal policy, or that employees with final policymaking authority ratified subordinate conduct that constitute municipal policy. *See Bryson*, 627 F.3d at 788.[17]

---

[17] By contrast to plaintiff's response to Sheriff Johnson's motion to dismiss, *see* Docket No. 81 at 14-15, plaintiff's response to Broomfield's motion to dismiss does not rely on cases wherein the plaintiff alleged the existence of a municipal policy by relying on instances of misconduct that only affected plaintiff. *See* Docket No. 82 at 11-14; *see e.g.*, *Arakji*, 2015 WL 7755975, at *6 (relying on instances wherein plaintiff was only alleged the victim of an informal custom in finding that plaintiff plausibly alleged a *Monell* claim).

To the extent that plaintiff seeks to proceed on a failure to train theory, *see* Docket No. 1 at 58, ¶ 309 ("Broomfield Entity Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent polices, which include customs and training), the Court does not find support for that theory in plaintiff's allegations. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Plaintiff does not allege how Broomfield employees were trained, who trained them, or identify specific deficiencies in training. *See Sexton*, 530 F. Supp. 3d 1072; *Erickson*, 489 F. Supp. 3d at 1208; *Bark* 2011 WL 1884691, at *3. Furthermore, in response to Broomfield's motion to dismiss, plaintiff only argues that it has plausibly alleged liability on an informal customs theory and does not address any allegations that support a failure to train theory. *See* Docket No. 82. Accordingly, the Court will only consider whether plaintiff plausibly alleges a *Monell* claim on the theory of there being an informal custom that amounts to a widespread practice.

While plaintiff alleges many instances that purport to show the existence of Turn Key's informal customs, *see* Docket No. 1 at 38-53, ¶¶ 250-278, these are irrelevant for purposes of showing whether Broomfield has an informal custom that amounts to a widespread practice. Plaintiff alleges that Turn Key employees, not Broomfield employees, had a "custom, policy, or practice of deliberate indifference" based on their individual disregard of Mr. Borkovec's "abnormal signs, symptoms, and labs" and failure to refer him for additional care. *See id.* at 38, ¶ 250. Plaintiff alleges that Turn Key had "financial incentives" to not order immediate testing, medicate patients, or refer patients for outside care when necessary. *See id.*, ¶ 251. Plaintiff goes on to allege several

instances in which Turn Key, at facilities other than the Broomfield Detention Center,

provided deliberately indifferent medical care.  *See id*. at 39-53, ¶¶ 255-278.  These

allegations do not address the existence of a municipal custom or policy at Broomfield

Detention Center.  Plaintiff provides no further allegations in support of the argument

that Broomfield had an informal custom "so permanent and well settled as to constitute

a custom or usage with the force of law."  *See Bryson*, 627 F.3d at 791.

Accordingly, the Court will grant that portion of Broomfield's motion to dismiss

that seeks the dismissal of plaintiff's *Monell* claim asserted on a theory of direct liability

against Broomfield.

### 3. *Indirect Liability* **Monell** *Claim against Broomfield*

As an initial matter, the Court addresses Broomfield's argument that plaintiff's

*Monell* claim, based on Turn Key's conduct, amounts to an improper vicarious liability

claim.  *See* Docket No. 46 at 10.  "Contracting out prison medical care does not relieve

the State of its constitutional duty to provide adequate medical treatment to those in its

custody, and it does not deprive the State's prisoners of the means to vindicate their

Eighth Amendment rights."  *West v. Atkins*, 487 U.S. 42, 56 (1988).  Pursuant to the

non-delegable duty doctrine, "a public entity may be indirectly liable under § 1983 for a

third party's policies when it contracts out its final policymaking authority to a third

party."  *Est. of Angelo*, 2024 WL 2274080, at *19-20 (rejecting defendant's argument

that "the non-delegable duty theory is impermissible vicarious liability and so should not

apply" because the non-delegable duty theory is "consistent with prior decisions from

courts in this District"); *see also Plutt v. Armor Corr. Health Servs., Inc.*, No. 21-cv-

02969-PAB-MDB, 2022 WL 4536234, at *10 (D. Colo. Sept. 28, 2022) (applying the

non-delegable duty theory and rejecting defendant's argument that it cannot be held liable for a contractor's unconstitutional policies).  Therefore, the Court rejects Broomfield's argument that plaintiff's claim constitutes an improper vicarious liability claim.

Plaintiff alleges that Broomfield contracted with Turn Key to provide medical services at Broomfield Detention Center.  *See* Docket No. 1 at 4, 5, 37, ¶¶ 20, 22, 248; *see also Est. of Angelo*, 2024 WL 2274080, at *20 ("Alleging that Jefferson County contracted with Wellpath to provide medical care at the JCDF is sufficient to establish that Jefferson County may be held liable for Wellpath's policies and customs relating to this provision of medical care.").  To plausibly allege a *Monell* claim against Broomfield on a non-delegable duty theory, plaintiff must allege that Turn Key "promulgated a policy or custom, that the policy or custom was the moving force behind the violation of the plaintiff's constitutional right, and that [Turn Key] enacted or maintained the policy with deliberate indifference to an almost inevitable constitutional injury."  *See id.* (internal quotations and citations omitted).

### a.  Constitutional Violation

Broomfield does not challenge this element.  *See* Docket No. 46 at 5-10. Therefore, for purposes of resolving Broomfield's motion to dismiss, Court assumes that plaintiff has adequately pled a constitutional violation against Broomfield.

### b.  Municipal Policy or Custom

In its motion to dismiss, Broomfield does not challenge that plaintiff plausibly alleges a *Monell* claim on a non-delegable duty theory.  Broomfield does not challenge the sufficiency of plaintiff's non-delegable duty theory allegations until its reply brief.

*See* Docket No. 105 at 5-8.  A "party waives issues and arguments raised for the first

time in a reply brief."  *Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) (quoting

*Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (quotations omitted)).

Accordingly, the Court declines to consider Broomfield's arguments.  *See, e.g.*, *Est. of*

*Lovern by & through Dailey v. Correct Care Sols., LLC*, No. 18-cv-02573-KLM, 2019 WL

2903589, at *7 (D. Colo. July 3, 2019) (because the "County Defendants have made no

argument regarding whether Plaintiffs' allegations with respect to [contractor's] policies

plausibly conform to the requirements set forth in *Monell*," the court drew "all inferences

with respect to those allegations in Plaintiff's favor" and found that "Plaintiffs have

plausibly alleged a policy, practice, or custom of [contractor] which is attributable to

Arapahoe County" such that it could not dismiss the *Monell* claim).

Even if the Court were to consider Broomfield's arguments, they are

undeveloped and cursory.  Broomfield argues that "Plaintiff failed to allege facts to

support the existence of the alleged customs, practices, and policies, which it is

required to do."  Docket No. 105 at 6.  Broomfield contends that the complaint is "devoid

of any allegations that Plaintiff voiced complaints of illness and/or requested medical

care while in custody at Broomfield Detention Facility."  *Id.*  Broomfield does not explain

why the alleged instances of deliberate indifferent medical care provided by Turn Key at

other facilities do not support the existence of an informal custom.  Broomfield does not

cite authority for the proposition that Mr. Borkovec was required to "voice[] complaints of

illness" or request medical care to show that a custom or policy existed.  *See id.*

Broomfield contends that plaintiff fails to "allege how the purported policies, customs,

and practices identified . . . caused Borkovec's death."  *See id.*  The Court finds that, in

60

drawing all reasonable inferences, the complaint alleges that Turn Key's customs and policies – particularly that of delaying or denying indicated treatment, refusing to refer patients for emergency care and transferring patients without necessary continuity of care, *see* Docket No. 1 at 37-38, ¶ 249 – resulted in Turn Key's failure to provide treatment and perform follow-up testing regarding Mr. Borkovec's staph infection, which ultimately caused his death. *See id.* at 13-17, ¶¶ 77-106. Plaintiff plausibly alleges that Turn Key's failure to inform Boulder County Jail that Mr. Borkovec's blood cultures tested positive for staph bacteremia resulted in a substantial risk to Mr. Borkovec's health. *See id.*

Accordingly, the Court will deny that portion of Broomfield's motion to dismiss that seeks the dismissal of Claim Two against Broomfield, asserted on a non-delegable duty theory.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that the City and County of Broomfield's Motion to Dismiss [Docket No. 46] is **GRANTED in part and DENIED in part**. It is further

**ORDERED** that the portion of Claim Two asserted against Broomfield on a theory of direct liability is **DISMISSED without prejudice**. It is further

**ORDERED** that Shonda High's Motion to Dismiss [Docket No. 48] is **GRANTED**. It is further

**ORDERED** that Claim One against Ms. High is **DISMISSED without prejudice**.[18]  It is further

**ORDERED** that Blake Morrow's Motion to Dismiss [Docket No. 49] is **GRANTED**.  It is further

**ORDERED** that Claim One against Mr. Morrow is **DISMISSED without prejudice**.[19]  It is further

**ORDERED** that Sheriff Curtis Johnson's Motion to Dismiss [Docket No. 51] is **GRANTED**.  It is further

**ORDERED** that Claim Two against Sheriff Johnson in his official capacity is **DISMISSED without prejudice**.  It is further

**ORDERED** that Alexis Henderson, Tiffany Jones, Jack Markling, Deyanira Martinez, and Kaela Seeburger's Motion to Dismiss [Docket No. 52] is **GRANTED**.  It is further

**ORDERED** that Claim One against Ms. Henderson is **DISMISSED with prejudice**.  It is further

**ORDERED** that Claim One against Ms. Jones is **DISMISSED with prejudice.**  It is further

**ORDERED** that Claim One against Ms. Seeburger is **DISMISSED with prejudice**.  It is further

---

[18] Ms. High did not raise a defense of qualified immunity.  *See* Docket No. 48.  Because Ms. High does not otherwise argue, and the Court does not find, that "granting leave to amend would be futile," the Court will dismiss Claim One against Ms. High without prejudice.  *See Brereton*, 434 F.3d at, 1219.

[19] Mr. Morrow did not raise a defense of qualified immunity as a Maxim employee.  *See* Docket No. 49.  For the reason noted *supra* n.19, the Court will dismiss Claim One against Mr. Morrow without prejudice.

**ORDERED** that Claim One against Mr. Markling is **DISMISSED with prejudice**.[20]  It is further

**ORDERED** that Claim One against Ms. Martinez is **DISMISSED with prejudice**. It is further

**ORDERED** that Jennifer Samuels's Motion to Dismiss [Docket No. 64] is **DENIED.**  It is further

**ORDERED** that Ms. Henderson, Ms. Jones, Ms. Seeburger, Mr. Markling, and Ms. Martinez are terminated from this case.

DATED September 10, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[20] Because Ms. Henderson, Ms. Jones, Ms. Seeburger, Mr. Markling, and Ms. Martinez are entitled to qualified immunity, the Court will dismiss Claim One against them with prejudice.  *See Clark v. Wilson,* 625 F.3d 686, 692 (10th Cir. 2010) (instructing the district court to grant defendants' motion to dismiss based on qualified immunity "with prejudice"); *McCrary v. Jones*, 2015 WL 873641, at *6 (W.D. Okla. Feb. 27, 2015) (dismissing claim with prejudice where defendant was entitled to qualified immunity).